# In the United States Court of Federal Claims

No. 13-71C
(Filed Under Seal: August 13, 2014)
(Reissued for Publication: August 25, 2014)*

```
*************************************
COASTAL ENVIRONMENTAL GROUP,    *
INC.,                           *
                                *
                   Plaintiff,   *
                                *
v.                              *
                                *
THE UNITED STATES,              *
                                *
                   Defendant.   *
*************************************
```

Bid Protest; Supplemental Administrative
Record; RCFC 11(c)(3), Order to Show
Cause; RCFC 11(b)(3), Factual Basis for
Representations to the Court; RCFC
11(c)(2), Motion for Sanctions; Inherent
Power to Sanction; Backdated Document;
Affidavit That Conflicts With Other
Materials; Sanctions Imposed

Brian W. Craver, Washington, DC, for plaintiff.

Devin A. Wolak, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

     This bid protest concerns the procurement of soil remediation services by the United States Environmental Protection Agency ("EPA"). In its initial complaint, plaintiff contended that the contracting officer improperly awarded the contract to another bidder despite her beliefs that the awardee's bid was nonresponsive and that the awardee was not responsible. The EPA subsequently terminated the contract for its convenience, leading defendant to move for dismissal of the protest as moot. Plaintiff opposed the dismissal of its protest, and sought leave to amend its complaint to challenge the EPA's apparent decision to cancel the procurement. In a December 16, 2013 Opinion and Order, the court concluded that plaintiff's original protest was moot, but allowed plaintiff to file a supplemental complaint challenging the EPA's purported cancellation decision.[1]

---

    * This reissued Opinion and Order incorporates the redactions of the names of former defense counsel and agency counsel proposed by defendant on August 22, 2014. The names are substituted with "[former defense counsel]" and "[agency counsel]," as appropriate.

    [1] Because plaintiff sought to amend its complaint to set out events that occurred after it filed its protest, the court treated plaintiff's motion for leave to amend its complaint as a motion

After plaintiff filed its supplemental complaint, defendant filed a supplemental administrative record containing documents pertaining to the EPA's decisions to terminate the originally awarded contract and to use existing contracting vehicles to satisfy its soil remediation needs.  Upon comparing the supplemental administrative record with the factual contentions contained in defendant's earlier filings,[2] the court became concerned that some of those contentions may have lacked evidentiary support in violation of RCFC 11(b)(3).  Accordingly, the court directed defendant to show cause why it had not violated that rule.

In the course of investigating the apparent inconsistencies between the supplemental administrative record and its earlier statements, defendant discovered that one of the documents in the supplemental administrative record contained incorrect information and was actually created ten months after the date indicated on the face of the document.  The discovery of this inaccurate, backdated document caused the parties and the court to question the integrity of the entire administrative record.  This concern was addressed in subsequent filings by the parties–including two motions for sanctions filed by plaintiff–and discussed during proceedings conducted by the court to address whether defendant engaged in sanctionable conduct.

Upon reviewing the parties' submissions and hearing argument, the court concludes that defendant engaged in sanctionable conduct and that the imposition of sanctions is appropriate for some of that conduct.  Most significantly, the court finds that EPA personnel acted in bad faith by manufacturing an inaccurate, backdated document; including that document in the supplemental administrative record; and certifying that the supplemental administrative record constituted an accurate record of the relevant EPA actions.  As discussed in more detail below, the court sanctions the EPA for its misconduct.

## I.  BACKGROUND

On March 29, 2012, the EPA issued an invitation for bids to remediate the soil on as many as 2,600 residential properties at the Omaha Lead Site ("OLS") in Omaha, Nebraska.  The EPA ultimately awarded the contract to PK Management Group, Inc. ("PK").  After an unsuccessful protest before the United States Government Accountability Office, plaintiff lodged a protest in the United States Court of Federal Claims ("Court of Federal Claims"), alleging that the EPA improperly awarded the contract to a bidder with a nonresponsive bid and that the United States Small Business Administration improperly determined that PK was a responsible bidder in the absence of a finding that PK submitted a responsive bid.  Defendant, who at that time was represented by [former defense counsel] of the United States Department of Justice

---

to supplement its complaint pursuant to Rule 15(d) of the Rules of the United States Court of Federal Claims ("RCFC").

[2]  These earlier filings were not prepared or submitted by defendant's present counsel of record.

("DOJ"), filed an administrative record.  However, before the parties completed briefing on the merits of the protest, defendant advised the court in a March 5, 2013 notice that the "EPA intend[ed] to terminate for convenience the contract that it awarded to PK in this procurement, thereby concluding the procurement," and "then reassess its needs for these lead remediation services."  Consequently, defendant stated, it intended to move for dismissal of the protest as moot.

As defendant represented, the EPA terminated its contract with PK and defendant moved to dismiss the protest, noting, among other things, that the EPA intended to issue a new solicitation for soil remediation services in the near future and that plaintiff would be entitled to compete for this contract if it chose to do so.  Plaintiff opposed defendant's motion.  On July 9, 2013, after the parties had concluded briefing, defendant filed another notice indicating that federal government sequestration had adversely affected the EPA's procurement of soil remediation services and that, as a result, the EPA intended to satisfy its remediation needs through existing contracts, rather than through a new contract as defendant previously represented in its motion to dismiss.[3]  In response to the court's request for supplemental briefing, defendant filed a renewed motion to dismiss, which plaintiff also opposed.

After briefing on the renewed motion to dismiss was complete, Devin A. Wolak entered an appearance in the protest, replacing [former defense counsel] as counsel of record for defendant.  Thereafter, plaintiff moved to amend its complaint to challenge the EPA's purported cancellation of the soil remediation procurement.  In its December 16, 2013 Opinion and Order, the court concluded that plaintiff's initial protest was moot, but that plaintiff could file a supplemental complaint adding allegations relating to the EPA's purported cancellation decision.

### A.   The Supplemental Administrative Record and the Show Cause Order

Plaintiff filed its supplemental complaint on December 20, 2013, adding a claim challenging the EPA's purported cancellation of the original procurement, i.e., the procurement that resulted in the award of the contract to PK.  Supplemental Compl. ¶¶ 28-40.  Defendant subsequently filed a supplemental administrative record containing documents relating to the EPA's termination of its contract with PK for the government's convenience and the EPA's decision to use existing contract vehicles to satisfy its soil remediation needs.  Attached to the supplemental administrative record was the following certification:

CERTIFICATION OF CONTRACTING OFFICER FOR SUPPLEMENTAL
ADMINISTRATIVE RECORD REGARDING SOLICITATION SOL-R7-00016
AND MATTERS RAISED IN THE AMENDED COMPLAINT FILED BY

---

[3]  Sequestration refers to the significant automatic cuts to federal government spending that went into effect on March 1, 2013.  See Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240, amended by American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 901, 126 Stat. 2313, 2370 (2013).

COASTAL ENVIRONMENTAL GROUP, INC.,
IN BID PROTEST FED. CL. NO. 13-71C

I, Yolanda Nero, contracting officer and custodian of the contracting office
files for Solicitation SOL-R7-00016, hereby certify, to the best of my knowledge
and belief, and after careful review, that the following documents constitute the
record of administrative actions performed with respect to the above-referenced
solicitation that are relevant to the issues raised in the plaintiff's amended
complaint.  The documents contained in the administrative record are the
documents maintained in accordance with this agency's procurement regulations,
FAR § 4.803, as well as documents identified in Appendix C to the Rules of the
United States Court of Federal Claims.

This certification, dated January 31, 2014, was executed on Ms. Nero's behalf by her supervisor,
Carlethia Thomas, who is the Acquisition Section Chief for EPA Region 7.

Believing that there were additional documents that would support its claim, plaintiff
moved to supplement the administrative record.  In a February 21, 2014 order,[4] the court denied
plaintiff's motion.  However, upon reviewing the parties' briefs and the supplemental
administrative record, the court became troubled by the apparent inconsistencies between the
evidence in the record and several of defendant's prior representations to the court relating to (1)
the EPA's intent in March 2013 to issue a new solicitation for soil remediation services and (2)
the role that sequestration played in the EPA's eventual decision not to issue a new solicitation.
Thus, in the same order, the court wrote:

With respect to the first issue, defendant made the following affirmative
statements in its March 11, 2013 motion to dismiss:

- "The agency is currently reassessing its needs with respect to
  the lead remediation services that were the subject of the
  terminated contract.  It intends to issue a new solicitation in the
  near future."  Def.'s Mot. 1.

- "[The EPA] is currently reassessing its need for the lead
  remediation services provided for in the contract with PK, and
  intends to issue a revised solicitation in the near future."  Id. at
  5.

However, there are no documents in the administrative record supporting
defendant's March 11, 2013 assertion that as of that date, the EPA "intend[ed]" to

_____

[4]  The court initially filed this order under seal.  It reissued the decision for public
availability on February 28, 2014.

-4-

issue a new or revised solicitation "in the near future."  In fact, the only document in the record dated on or before March 11, 2013, that addresses this topic–a March 8, 2013 OLS briefing document–indicates that the [Lawson Environmental Services LLC ("Lawson")] contract might "supply sufficient quantity to complete the work based on sampling results," and that "[a] new contract could be issued in the future if necessary."  [Administrative R. ("AR")] 1158.  In other words, it appears that at the time that defendant made its assertion, the EPA did not intend to issue a new or revised solicitation "in the near future"; rather, the EPA was merely contemplating that a new contract could be issued if the results of the sampling reflected that work could not be completed under the Lawson contract.

With respect to the second issue, defendant made the following affirmative statements in its July 9, 2013 notice and its September 23, 2013 reply in support of its renewed motion to dismiss:

- "Since [March 11, 2013], Government sequestration has decimated EPA's budget, forcing the agency to furlough its employees.  As a result of these severe budget constraints, EPA has decided to satisfy its lead remediation needs through existing contracts . . . .  EPA will, thus, change the scope of the requirement of the disputed solicitation from a remediation contract to a contract for securing property access agreements."  Notice 1.

- "Long-term sequestration has forced EPA to take a hard look at its budget.  It has determined that it can save money by satisfying its lead remediation needs under [] existing contracts."  Def.'s Reply 11.

However, the administrative record contains only one reference to sequestration's effect on the EPA's decision not to issue a new soil remediation contract, and that reference indicates that sequestration did not affect the EPA's decision.  In a July 23, 2013 electronic-mail message, an employee at the EPA's District 7 office advised an individual at EPA headquarters:  "[T]he [termination for convenience] was not the result of sequestration but the new contract was the result of reviewing and reworking the statement of work."  AR 1212; see also id. at 1211 (explaining that the EPA reassessed its needs for a second remediation contractor because there did not appear to be as many properties needing remediation as it originally believed).  There are no other references to sequestration in the administrative record; moreover, there are no affirmative statements that any sort of financial constraints played a role in the EPA's decision not to issue a new contract.  The only stated reason for the EPA's decision was the lower-than-anticipated number of properties requiring remediation.

Order 3-4.  Based on these inconsistencies, the court expressed its concern that by filing its March 11, 2013 motion to dismiss, its July 9, 2013 notice, and its September 23, 2013 reply, defendant made factual contentions without evidentiary support in violation of RCFC 11(b)(3). The court therefore directed defendant to show cause why that rule was not violated by explaining the evidentiary basis for the statements at issue and citing to the relevant portions of the administrative record.  The court also directed defendant to identify who was responsible for the inconsistencies.

## B.  Discovery of an Inaccurate, Backdated Document

Defendant initiated an investigation so that it could prepare a response to the show cause order.  During the course of this investigation, defendant discovered a problem with one of the documents in the supplemental administrative record–a document titled "Determination and Findings" that allegedly was signed by Ms. Nero on March 11, 2013.  This document purported to provide the basis for the EPA's termination of its contract with PK for the government's convenience, and provided, in part:

> 19.  A [termination for convenience] determination and finding was written on March 11, 2013, for the following reasons:
>
>> a.  Given the progress that has been made on the site in acquiring access, sampling and residential property cleanup over the two construction seasons during the delays in contracting caused by challenges and protests, it was determined that EPA had the ability to achieve the remediation of the remaining available properties at the Omaha Lead site on the existing contract to perform the remaining soil remediation work.
>>
>> b.  Increased costs to [sic] P.K. Management, Inc[.] was incurring due to the protests and challenges.

AR 1159-61.

Defendant advised plaintiff on March 6, 2014, that there was an undisclosed problem with this document and that the document might need to be withdrawn from the administrative record.  Plaintiff thereafter filed a second motion to supplement the administrative record, requesting permission to conduct depositions to ascertain the circumstances surrounding the creation of the problematic document and any additional discovery that the court deemed to be appropriate.

In its response to plaintiff's motion, defendant disclosed two issues with the document at issue.  One issue was that paragraph 19(a) appeared to be inaccurate.  The other issue was that

the document was actually created after-the-fact, and then backdated.  In particular, defendant reported:

> Counsel for the defendant and agency counsel inquired about the apparent inconsistencies, and the contracting officer informed both counsel that she had actually prepared the March 11, 2013 [Determination and Findings] in early January 2014, then backdated it to March 11, 2013, and she had not informed counsel that she had done this when she produced it as a document to be included in the supplementation to the certified administrative record.  The defendant is still in the process of investigating why this happened, including why there appears to have been a disconnect between what the contracting officer thought about EPA's requirements on March 11, 2013, and what those requirements actually were.

Def.'s Resp. 4.  Defendant requested that it be permitted to address this document more fully in its yet-to-be-filed response to the show cause order so that it could have additional time in which to investigate the document's creation.

The court convened a telephonic status conference on March 20, 2014, to discuss defendant's revelations.  Participants in the conference included counsel of record for the parties and EPA counsel, [agency counsel].[5]  During the status conference, the court advised the parties that defendant's revelations were very troubling, and placed the integrity of the administrative record into doubt.[6]  It indicated that it would entertain a request from plaintiff for an award of the attorney's fees and costs that plaintiff incurred in addressing the issues related to the inaccurate, backdated document.  The court also stated that it was inclined to permit plaintiff to depose Ms. Nero regarding the inaccurate, backdated document.  At the conclusion of the status conference, as reflected in a subsequent order, the court directed defendant to address all of the outstanding ethical issues in its response to the show cause order, granted plaintiff leave to file a reply in support of its supplementation motion and response to defendant's response to the show cause order, and scheduled proceedings to discuss the show cause order and hear argument on plaintiff's supplementation motion.

---

[5]  Defendant did not include [agency counsel]'s name on any filings with the court until February 18, 2014, when it filed its response to plaintiff's first motion to supplement the administrative record.  Documents submitted by defendant in the appendix attached to its response to the show cause order reflect that [agency counsel]'s involvement in this case began no later than February 15, 2013.  App. 1.

[6]  All three attorneys appearing at the status conference were equally troubled by the disclosed conduct.  Mr. Wolak and [agency counsel] further stated that they were taking the issue very seriously.

### C. Defendant's Response to the Show Cause Order

Defendant filed its response to the show cause order on April 7, 2014, addressing three main topics: (1) the inconsistencies between defendant's statements to the court and the administrative record pertaining to the EPA's intent to issue a new solicitation in the near future; (2) the inconsistencies between defendant's statements to the court and the administrative record pertaining to the effect of sequestration on the EPA's decision not to pursue a new soil remediation contract; and (3) the inaccurate, backdated document. With respect to the first two topics, defendant generally explained that the statements quoted by the court were based upon information provided to counsel by Ms. Nero and Ms. Thomas. According to defendant, because there was no "formal recordkeeping requirement" for the EPA's decisions regarding whether and when to issue a solicitation for a new soil remediation contract, those decisions "were not memorialized in documents that would be included in a bid protest administrative record." Def.'s Show Cause Resp. 2-3. Therefore, defendant submitted extrarecord documentation of the information counsel was provided–mainly electronic-mail messages and three declarations–in an appendix attached to its response.

Defendant then addressed the inconsistent statements in more detail. First, it asserted that its statements regarding the EPA's intent to issue a new solicitation in the near future were based on communications from the EPA's contracting office, which had decided to issue a new solicitation after consultation with the relevant EPA program office. However, defendant explained, the program office had been reconsidering the need to issue a new solicitation even during its consultations with the contracting office, and ultimately, after defendant made its representations to the court, the EPA decided not to issue the new solicitation. In other words, defendant averred that its representations to the court were accurate at the time they were made. Defendant's assertions are supported by electronic-mail messages sent by EPA employees that defendant included in the appendix attached to its response. See, e.g., App. 2-5, 17, 23, 27-28.

Second, defendant averred that its statements regarding the effect of sequestration on the EPA's decision not to pursue a new soil remediation contract were based on communications from Ms. Thomas and David Drake, Ph.D., the Special Emphasis Remedial Section Chief in the Superfund Division in EPA Region 7. Specifically, defendant explained that both Ms. Thomas and Dr. Drake understood that the decision not to solicit a new contract was due to the reduced need for soil remediation at the OLS. However, defendant stated, Ms. Thomas believed that sequestration also played a role in the decision, and that when [former defense counsel] inquired about the status of the procurement in July 2013, both Ms. Thomas and Dr. Drake confirmed that sequestration was the basis for the EPA's decision. Thus, with respect to its representation in the July 9, 2013 notice that sequestration affected the EPA's decision not to issue a new soil remediation contract, defendant contended that its statement accurately reflected what the EPA had told [former defense counsel] as of that date. Defendant further contended that this same information from the EPA supported [former defense counsel]'s similar representation regarding sequestration contained in the September 23, 2013 reply brief.

Electronic-mail messages in the appendix attached to defendant's response support defendant's assertion that Ms. Thomas and Dr. Drake understood that the decision not to pursue a new soil remediation contract was due to the reduced number of properties requiring remediation.  See id. at 15-16 (containing a March 2013 assessment of the number of remaining properties requiring remediation), 39 (reflecting the May 2013 decision to issue a new contract for securing site access), 63-64 (describing the decision to change the scope of the requirement from a contract for soil remediation to a contract for obtaining property access agreements). Additional messages support defendant's assertion that as of July 9, 2013, [former defense counsel] had been advised by the EPA that sequestration resulted in the EPA's decision not to issue a new soil remediation contract.  See id. at 63-64.  Specifically, these messages reflect that Ms. Thomas understood that the EPA's decision was due to sequestration; that Dr. Drake confirmed Ms. Thomas's understanding; that Ms. Thomas therefore advised [agency counsel] that the EPA's decision was due to sequestration; and that [agency counsel] passed this information on to [former defense counsel] on July 8, 2013.  Id. at 63-64, 69; see also id. at 73-74, 77-78, 80-81, 91-92, 95-96, 100-01, 129-39 (indicating, in guidance provided to Ms. Thomas from her superiors, that EPA contracting offices should analyze existing contracts, planned acquisitions, and acquisitions in progress to determine potential cost savings, and that this information should be reported up the chain of command), 97-98, 122 (describing the EPA's temporary prohibition on awarding new contracts, effective March 5, 2013, pending the development of an operating plan in response to sequestration, and noting an exception for mission critical actions), 115-16 (confirming, in a March 20, 2013 memorandum sent to Regional Superfund Division Directors, that work within the Superfund Remedial Program, such as the ongoing soil remediation work at the OLS, was mission critical).  However, Dr. Drake later indicated that his confirmation of Ms. Thomas's understanding had been mistaken.  In an April 7, 2014 declaration included in defendant's appendix, Dr. Drake stated that he should not have confirmed that sequestration was the reason for the EPA's decision not to issue a new soil remediation contract.  Id. at 206.  He explained that there are "no budget constraints" at the OLS and that "[t]he project is fully funded and has excess funding in a dedicated site-specific special account."  Id.  He also stated:

> Sequestration played a minor ancillary role in my opinion but I believe it is relevant to some degree.  The main role that sequestration played was the delay of the reprocurement activities, and with delay or the passage of time, the information from the Omaha Lead Site database becomes more accurate. Sampling and remediation work continued at the Omaha Lead Site during sequestration.  Thus the estimates of future remediation needs are more accurate over time as more information is generated so the contracting and re-procurement delays associated with sequestration ultimately helped to better scope the needs of the project.

Id.

Finally, defendant addressed the inaccurate, backdated document supplied by the EPA in the supplemental administrative record and the EPA's certification of the supplemental administrative record. It asserted that the normal procedure in the EPA Region 7 contracting office was for a Determination and Findings document to be prepared at the time a contract is terminated, but that Ms. Nero failed to do so for the PK contract termination in March 2013. Thus, defendant explained, when Ms. Nero learned in January 2014 that the administrative record filed with the court required supplementation, she prepared the missing Determination and Findings document, edited it at the direction of Ms. Thomas, and backdated it to March 11, 2013. Defendant further represented that Ms. Thomas was unaware that Ms. Nero backdated the document, and that she relied on the work of Ms. Nero when she certified the supplemental administrative record on Ms. Nero's behalf. In providing this explanation, defendant accurately relayed the statements made by Ms. Nero and Ms. Thomas in their declarations. However, the validity of some of those statements is questionable, especially in light of other documents included in the appendix attached to defendant's response; thus, the court describes this documentation and the relevant portions of the declarations in more detail.

The key documentation in defendant's appendix is a string of electronic-mail messages from January 6 and 7, 2014, between Ms. Nero and Ms. Thomas. In a January 6, 2014 message to Ms. Thomas, Ms. Nero wrote: "Here is a DRAFT COPY of the [Determination and Findings] with the changes you requested for the [termination for convenience] done on PK Management." Id. at 158. Paragraph 19 of the attached draft document provided:

> A [termination for convenience] determination and finding was written on March 10, 2013, for the following reasons:
>
> > a. Increased costs to [sic] P.K. Management, Inc[.] was incurring due to the protests and challenges.
> >
> > b. Given the progress that has been made on the site in acquiring access, sampling and residential property cleanup over the two construction seasons during the delays in contracting caused by challenges and protests, it was determined that EPA had the ability to achieve the remediation of the remaining available properties at the Omaha Lead site on the existing contract to perform the remaining soil remediation work.

Id. at 161. The following morning, Ms. Thomas responded: "Ok. Recommend you make item b the primary reason we did the [termination for convenience] and the financial hardship experienced by the contractor as the second reason." Id. at 158. Sixteen minutes later, Ms. Nero replied: "Yes [Ma'am]. Will . . . make those changes, sign and date it." Id. In other words, this electronic-mail exchange reflects that Ms. Nero and Ms. Thomas had been working on a draft document prior to Ms. Nero's January 6, 2014 message; that Ms. Thomas read paragraph 19 and recommended that it be edited; and that Ms. Nero intended to make the recommended change before signing and dating it.

Ms. Nero's declaration is generally consistent with the January 2014 electronic-mail exchange.  Ms. Nero stated:

1.  I am a Contracting Officer in Region 7 of the United States Environmental Protection Agency (EPA or Agency).  I have been in this position since February 2001.  I have worked at EPA for approximately 13.5 years. . . .  I am aware that this declaration will be used in official proceedings, specifically a bid protest brought by Coastal Environmental Group, Inc., at the United States Court of Federal Claims, docket no. 13-71C.

. . . .

4.  Due to a major chest surgery, I was physically out of the office from December 12, 2012 through February 08, 2013 and had minimum direct involvement in the discussions and/or decisions made regarding the above referenced contract during that time.  My supervisor handled all actions on this contract during my absence.  On February 11, 2013, I physically returned to work and resumed my work activities and became acclimated to the actions that had taken place during my absence.

. . . .

8.  On March 6, 2013, I issued a Notice (No Cost) of Termination for Convenience (T4C) to PK Management Inc. based on my supervisor's (Lee Thomas) handwritten notes as my supporting documentation. . . .

9.  On March 11, 2013, I issued a bi-lateral No Cost T4C Modification signed by both PK Management Group and myself.  . . .

10.  After the T4C modification was issued, the next step was to prepare a [determination and findings (D&F)] memorandum that summarized my actions per my supervisor's internal policy.  I did not write the D&F at that time which was an oversight.  Later, in reviewing the file, I corrected the oversight by completing a D&F that tied the facts and actions of the determination together to support the T4C modification.

11.  On January 7 [sic], 2014, after [the Office of General Counsel] informed my supervisor via email that we need[ed] to provide additional information for the administrative record in the ongoing Court of Federal Claims case involving Coastal, I prepared the D&F and included the additional information received from the Superfund Program office and referenced in item 19a of the D&F.

12.   The D&F memorandum included an action item that was not accurate at the time the T4C was issued.  Item 19a was not applicable to the justification for the T4C action.  Instead, it was information received from the Superfund Program office that applied to the justification to not re-procure the soil remediation services after the T4C action.

13.   I did not realize that back-dating the D&F would result [in] such dire consequences.  I back-dated the D&F document not realizing the damage it caused to our T4C action.  The intent of the back-dating was to support the T4C action already taken to complete the contract file.  My poor judgment was not a willful or intentional act to deceive.  It truly was an honest human mistake.

14.   Since my tenure as a contracting officer, I have strived to serve as a good steward of the federal government.  I have maintained a strong demonstration of good will and character throughout the years of service as a contracting officer.

Id. at 163-66.  Portions of Ms. Thomas's declaration, however conflict with the electronic-mail exchange.  Ms. Thomas declared:

1.  I am the Acquisition Section Chief, Acquisition Contracts & Management Section, Region 7, Environmental Protection Agency.  I have been in this position since November 2007.

2.  I am aware that this declaration will be used in official proceedings, specifically a bid protest brought by Coastal Environmental Group, Inc., at the United States Court of Federal Claims, docket no. 13-71 C.

. . . .

22.  Yolanda Nero was the Contracting Officer of record for the [P.K. Management Group, Inc (PKMG)] contract.  She was not involved in the termination of the PKMG contract as she had been on extended sick leave through February 11, 2013.  During her absence, I conducted the termination activities with PKMG and provided Yolanda handwritten notes which she used to issue the termination notice and subsequent termination modification.

23.  Despite Yolanda's noninvolvement in the events leading up to the termination of PKMG, she had returned to work in time to perform the tasks necessary to formalize the termination.  Included among those tasks was the requirement to complete a memorandum to the file about the termination.  This documentation requirement is my own, I put it in place in January 2008, and the purpose is to prepare memorandums or summary notes to tie together the various

emails and notes that were used to support a modification action.  Normally the COs prepare[] the memos when performing contract file maintenance activities.

24.  Yolanda developed the document in January 2014 and forwarded me an electronic version so I could verify the information since she had not been involved.  The electronic version did not include a signature or date.  The memo contained information about putting the work on the existing contracts which was not the situation at the time but I completely missed it during my review.  That information was not in my notes but was obtained from the program customer via an email after the termination for convenience was done.

25.  Yolanda showed me the stack of documents she intended to submit to the Contracts and Department of Justice Attorneys, but I did not screen the documents to verify or check any information. Yolanda cc'd me on her email submission but I did not open the email.  I just considered that email as proof that she got the documents sent.

26.  After learning that Yolanda had backdated a document, I counseled her and told her effective immediately . . . not to engage in any activities as a Contracting Officer until further notice.  I was not authorized to suspend her warrant so I contacted Raoul Scott, EPA, OAM, Regional Procurement Operations Division, and informed him of the situation.  Mr. Scott has since suspended Yolanda's warrant indefinitely.

. . . .

27.  When Yolanda was out of the office on her compressed day off, I was asked to review the Administrative Record and certify if it was accurate correct [sic].  I was informed that this needed to be a very quick process and as I had done in the past, when a CO has been absent, I signed certifying that the record was accurate and complete as I had no reason to think otherwise.  I erred in certifying the record as accurate and complete because I did not scan down the list of attachments reflected in the table of contents to check each document.

Id. at 185-92.  Within these quoted paragraphs Ms. Thomas, problematically, implies that she was unaware that Ms. Nero had not prepared a Determination and Findings document in March 2013 when the contract with PK was terminated (even though it was apparent that the document that Ms. Nero provided to Ms. Thomas in January 2014 was a draft); implies that she was unaware that Ms. Nero intended to backdate the document (even though paragraph 19 of the draft document indicates that the document "was written on March 11, 2013," id. at 161); and states that she "completely missed" the fact that the draft document contained incorrect information in paragraph 19 (even though she read and suggested a change to paragraph 19 in January 2014 to

reflect that the incorrect information be deemed the primary reason for the termination for convenience).

### D.  Defendant's Motion to Supplement the Administrative Record

Defendant's response to the show cause order left open an important issue:  what to do with the administrative record currently on the protest docket?  Defendant had previously indicated–in its March 14, 2014 response to plaintiff's second motion to supplement the administrative record and during the March 20, 2014 status conference–that it intended to recertify the administrative record.  It then requested, in its response to the show cause order, a deadline of April 11, 2014, to accomplish the recertification.  Finding defendant's request to recertify the administrative record to be vague, the court directed defendant to file a motion that explained how exactly it wanted to proceed (file a new record or rely on some or all of the existing, flawed record).  In accordance with the court's directive, defendant filed a motion to supplement the administrative record.  It requested that the record be supplemented with the documents attached to its response to plaintiff's second motion to supplement the administrative record and the appendix attached to its response to the show cause order,[7] and stated that Ms. Thomas, who replaced Ms. Nero as the responsible contracting officer, would review the documents and certify the record.  Defendant further proposed that none of the existing documents, including the inaccurate, backdated document, be removed from the record.

### E.  Plaintiff's Response to Defendant's Filings

In two filings on April 18, 2014, plaintiff addressed defendant's (1) response to its second motion to supplement the administrative record, (2) response to the show cause order, and (3) motion to supplement the administrative record.  In the first filing, a memorandum, plaintiff stated that it opposed the supplementation of the administrative record with the declarations of Ms. Nero, Ms. Thomas, and Dr. Drake, but requested that if the court allowed these declarations to be included in the record, that it be permitted to depose the declarants regarding their statements and then supplement the record with all or portions of the deposition transcripts, as well as to conduct limited, related discovery.  Plaintiff also requested that the court strike the inaccurate, backdated document from the record.

In its second filing, a motion for sanctions under RCFC 11(c)(2), plaintiff contended that defendant violated RCFC 11(b) in two ways.  First, it averred that defendant failed to make a reasonable inquiry regarding the effect of sequestration on the EPA's decision not to pursue a new soil remediation contract.  Specifically, it noted that from July 9, 2013, forward, defendant maintained the position that sequestration affected the procurement decision, even though plaintiff repeatedly contended in its own filings that sequestration was irrelevant.  Indeed,

---

[7]  The documents attached to defendant's response to plaintiff's second motion to supplement the administrative record also appear in the appendix attached to defendant's response to the show cause order.  See App. 4, 27-28.

plaintiff advanced this argument in its September 9, 2013 opposition to defendant's renewed motion to dismiss, its November 4, 2013 proposed amended complaint, its November 25, 2013 reply in support of its motion to amend its complaint, and its December 20, 2013 supplemental complaint.  The first of these submissions is of particular importance.  In its September 9, 2013 opposition, plaintiff stated:

> [I]t appears that EPA's suggestion in its July 9 2013 Notice that "sequestration" is forcing it to pursue this new contracting strategy is simply a pretext.  Defendant never planned to fund the canceled procurement from current year appropriations, but instead from a several hundred million dollar bankruptcy settlement now held in a "Superfund Trust" owned and managed by EPA.  EPA's website explains that the "Residual Sites Settlement Agreement" resolved claims between EPA and a manufacturing interest known as "ASARCO" pertaining to cleanup costs associated with Superfund sites in, among other places, Omaha, Nebraska.  The website announces that $186,500,000 is available to fund cleanup of the "Omaha Lead Superfund Site," described as covering "most of the eastern portion of metropolitan Omaha, Nebraska" near the former location of ASARCO's lead smelter and refinery.  EPA's intention to fund the cancelled procurement from the amounts received in settlement from ASARCO, now held in the "Superfund Trust," is confirmed in the Solicitation as follows:
>
> > The cleanup of residential properties at the OLS (e.g., the "Omaha Lead Site") is being funded from the Superfund Trust under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended . . . .
>
> Tab 02, AR 103 (emphasis . . . supplied).  Since the funding for this procurement was never going to be drawn from current year congressional appropriations, sequestration could not have affected it.

Pl.'s Opp'n 16-17 (footnote omitted).  Plaintiff attached to its brief a copy of the page from the EPA's website describing the ASARCO bankruptcy settlement, which indicated that as a result of the settlement, "[o]ver $186 million ($219,451,414 with interest) [would] be deposited into an EPA special account for cleanup" of the OLS.  Pl.'s Opp'n Attach. A at 1.

Second, plaintiff averred that defendant violated RCFC 11(b) by failing to make a reasonable inquiry regarding the inaccurate, backdated document, arguing that paragraph 19(a) of the document facially contradicted defendant's earlier statements to the court regarding the imminence of a new solicitation, and that reliance on a contracting officer's certification was not sufficient to satisfy RCFC 11(b)'s obligations.

Based on defendant's purported violations of RCFC 11(b), plaintiff requested that it be reimbursed for the attorney's fees and expenses it incurred beginning from July 9, 2013, the date

that defendant advanced the EPA's position that sequestration was the reason for the EPA's decision not to issue a new soil remediation contract.

### F.  Subsequent Proceedings, Orders, and Filings

The court convened proceedings on April 24, 2014, to discuss its show cause order, the parties' motions to supplement the administrative record, and plaintiff's motion for sanctions.[8] Later that day, the court issued an order indicating that the supplemental administrative record would remain on the court's docket, but forbidding the parties from relying on its contents during further proceedings on the merits of the protest.  Instead, the court directed defendant to compile a new, corrected administrative record that was to include the contemporaneous documentation of the EPA's decisions to terminate its contract with PK and not to issue a new soil remediation contract, but was not to include the inaccurate, backdated document or the declarations included in the appendix attached to defendant's response to the show cause order.  The court then denied the parties' motions to supplement the administrative record as moot.  In a separate order, the court set forth a schedule for briefing on the court's inherent power to impose sanctions, a topic that had arisen during the proceedings.

Defendant subsequently filed a response to plaintiff's motion for sanctions, arguing that the motion should be denied because plaintiff did not comply with RCFC 11(c)(2), which requires that a motion for sanctions be served on the opposing party at least twenty-one days before it is filed with the court; because it was entitled to the protection of the rule's safe harbor provision; and because it did not violate RCFC 11(b).  Two weeks later, defendant filed the corrected administrative record.

Plaintiff then filed a notice that it was voluntarily withdrawing its motion for sanctions. In its notice, plaintiff indicated that it had served another motion for sanctions on defendant to comply with RCFC 11(c)(2).  Plaintiff thereafter filed its second motion for sanctions with the court–twenty-four days after serving it on defendant.  This second motion for sanctions was substantively identical to plaintiff's original motion.  Responding to this second motion for sanctions, defendant argues that plaintiff did not cure the procedural defects of its original motion, that subsequent events have rendered plaintiff's motion inapposite, and that plaintiff has not established that defendant violated RCFC 11(b).

---

[8]  In its show cause order, the court expressed concern with statements contained in three documents filed by defendant–the March 11, 2013 motion to dismiss, the July 9, 2013 notice, and the September 23, 2013 reply.  [Former defense counsel] signed all three documents, a fact that defendant obviously knew.  Nevertheless, defendant did not offer an affidavit or declaration from [former defense counsel] in response to the show cause order and [former defense counsel] did not appear at the April 24, 2014 proceedings.  Instead, Mr. Wolak explained the basis of [former defense counsel]'s statements on [former defense counsel]'s behalf.  See Def.'s Show Cause Resp. 2-10; Tr. 4-19, 54-58, 65, 67-70.

The parties also completed briefing on the issue of the court's inherent power to impose sanctions.  In its memorandum, defendant argues that the court is prevented from imposing a monetary sanction on the government using its inherent powers because there has been no waiver of sovereign immunity.  Defendant further contends that the facts of this case do not support an award of monetary sanctions.  Plaintiff, in its memorandum, argues that the government has waived sovereign immunity with respect to a sanction of attorney's fees and expenses and that the facts of this case support such a sanction.  Briefing is now complete.

## II.  LEGAL AUTHORITY FOR SANCTIONS

As reflected above, under the circumstances presented in this case, there are two potential sources of authority under which the court could sanction defendant–RCFC 11(c) and the court's inherent power to impose sanctions.  The court addresses each potential source.

## A.  RCFC 11

Attorneys are obligated to ensure that their filings are not being presented to the court for an improper purpose, and that the representations in those filings are factually and legally sound.  These obligations are enshrined in RCFC 11, which provides:

> Representations to the Court.  By presenting to the court a pleading, written motion, or other paper–whether by signing, filing, submitting, or later advocating it–an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)  it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)  the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)  the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4)  the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

RCFC 11(b).  RCFC 11 "is aimed at curbing baseless filings, which abuse the judicial system and burden courts and parties with needless expense and delay."  Judin v. United States, 110 F.3d 780, 784 (Fed. Cir. 1997) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 397-98 (1990)).  Thus, to avoid running afoul of RCFC 11, attorneys must engage in a factual and legal inquiry, reasonable under the circumstances, prior to presenting filings to the court.  RCFC 11(b); accord Fed. R. Civ. P. 11 advisory committee's note, 1993 Amendments ("FRCP 11 note") ("The rule continues to require litigants to 'stop-and-think' before initially making legal or factual contentions."); see also Chambers v. NASCO, Inc., 501 U.S. 32, 47 (1991) (noting that Rule 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith").

Parties who are alleged to have violated RCFC 11(b) must be provided with notice of the possible violation and an opportunity to be heard before sanctions are imposed.  RCFC 11(c)(1).  If, after such notice and opportunity to respond, the court determines that a party has violated RCFC 11(b), it may "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  RCFC 11(c)(1); accord FRCP 11 note ("The sanction should be imposed on the persons . . . who have violated the rule or may be determined to be responsible for the violation.").  Any sanction imposed by the court "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  RCFC 11(c)(4); accord FRCP 11 note ("[T]he sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.").  Sanctions "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  RCFC 11(c)(4).  In determining an appropriate sanction, the court may consider, among other things:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; . . . whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; [and] what amount is needed to deter similar activity by other litigants[.]

FRCP 11 note.

The notice and opportunity to respond required by RCFC 11(c)(1) may be accomplished in two ways–an order to show cause issued by the court or a motion for sanctions served and filed by an opposing party.

**1. The Court's Order to Show Cause**

Under RCFC 11(c)(3), a "court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated RCFC 11(b)." As previously noted, when the court first identified issues with defendant's filings, it proceeded under RCFC 11(c)(3) and ordered defendant to show cause why it had not violated RCFC 11(b)(3) by making factual contentions to the court that lacked evidentiary support. In the course of investigating the basis for those contentions, defendant discovered that it had filed with the court two problematic documents prepared and signed by EPA employees–an inaccurate, backdated document contained within the supplemental administrative record and a contracting officer certification that attested to the integrity of the supplemental administrative record. The court indicated during a status conference that it was troubled by the inclusion of a manufactured document in the supplemental administrative record and noted that it would entertain a request for sanctions from plaintiff. Defendant subsequently addressed the inaccurate, backdated document and the problematic contracting officer certification in its response to the show cause order. Accordingly, although these two tainted documents were not the subject of the show cause order, the court possesses the authority to sanction conduct related to those documents under RCFC 11(c) because defendant had the required notice and an opportunity to address the preparation and filing of those documents. Available sanctions include nonmonetary directives or penalties paid to the court, but exclude attorney's fees and expenses.

**2. Plaintiff's Motions for Sanctions**

The necessary notice and opportunity to respond may also be initiated by a party. Specifically, if a party believes that an opponent violated RCFC 11(b) and should be sanctioned as a result, it may prepare a motion "describ[ing] the specific conduct that allegedly violates RCFC 11(b)" and serve that motion on its opponent. RCFC 11(c)(2). After twenty-one days, the party may file the motion with the court, but only if its opponent has not "withdrawn or appropriately corrected" the alleged violation. Id. The service requirement in this safe harbor provision is strictly construed. See, e.g., Islamic Shura Council of S. Cal. v. FBI, 725 F.3d 1012, 1014 (9th Cir. 2013) (stating that a motion for sanctions may not be filed absent strict compliance with the service requirement of the safe harbor provision); Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd., 682 F.3d 170, 175 (2d Cir. 2012) (holding that an "informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient to trigger the 21-day safe harbor period"); Gordon v. Unifund CCR Partners, 345 F.3d 1028, 1030 (8th Cir. 2003) (holding that it is an abuse of discretion for a district court to grant a request for sanctions when a motion for sanctions was not previously served on the opposing party); Photocircuits Corp. v. Marathon Agents, Inc., 162 F.R.D. 449, 452 (E.D.N.Y. 1995) (rejecting the defendants' contention that they were not bound by the requirements of the safe harbor provision because the court granted them leave to file a motion for sanctions if they chose to do so, and rejecting the defendants' additional contention that the safe harbor provision was inapplicable because plaintiff had more than twenty-one days to take corrective action).

In its initial motion for sanctions, plaintiff contended that defendant violated RCFC 11(b) by failing to make a reasonable inquiry regarding the effect of sequestration on the EPA's decision not to pursue a new soil remediation contract and by failing to make a reasonable inquiry regarding the inaccurate, backdated document.  However, plaintiff did not serve this motion on defendant twenty-one days before filing it with the court, as required by RCFC 11(c)(2).  The motion was, therefore, procedurally defective.  Recognizing this fact, plaintiff withdrew its initial motion and served defendant with a substantively identical motion.  Then, more than twenty-one days after serving the second motion on defendant, plaintiff filed the motion with the court.

Defendant contends that plaintiff's second motion for sanctions was improper because defendant had "appropriately corrected" the purported violations of RCFC 11(b) identified by plaintiff prior to plaintiff filing the motion with the court.  These "appropriate[] correct[ions]," asserts defendant, were the explanations it provided in its response to the order to show cause and during the April 24, 2014 proceedings.  Defendant argues that plaintiff, in its motion for sanctions, was required to address why defendant's explanations did not address plaintiff's concerns.  Defendant is mistaken.  All that is required by RCFC 11(c)(3) is that plaintiff "describe the specific conduct that allegedly violates RCFC 11(b)" that had not been "withdrawn or appropriately corrected . . . ."  If plaintiff believed that violations of RCFC 11(b) continued to exist after serving its motion for sanctions on defendant, it was permitted to file the motion with the court.  It is then for the court to decide whether defendant "appropriately corrected" the purported violations.

Defendant also argues that there is no basis for the second alleged violation of RCFC 11(b) identified by plaintiff–defendant's purported failure to make a reasonable inquiry regarding the inaccurate, backdated document–because it complied with the court's order directing it to file a corrected administrative record without the offending document before plaintiff filed its motion for sanctions.  From defendant's perspective, its compliance with the court's order satisfies the requirements of RCFC 11(c)(2)'s safe harbor provision.  Defendant is incorrect.  First, defendant has not withdrawn the inaccurate, backdated document.  Although the court directed defendant to file a corrected administrative record that did not contain the inaccurate, backdated document, it noted that the corrected administrative record was to be used as the basis for further proceedings on the merits, and expressly stated that the supplemental administrative record containing the inaccurate, backdated document would remain on the docket.  At no point has defendant moved to strike or withdraw the inaccurate, backdated document from the court's docket.  Indeed, in its motion to supplement the administrative record, defendant explicitly proposed that the inaccurate, backdated document remain in the record.  Second, common sense dictates that the filing of a manufactured document in an administrative record can be "appropriately corrected" only by moving to withdraw or strike that document from the administrative record; merely providing explanations regarding how and why the document was manufactured is insufficient.  Accordingly, defendant's failure to seek the removal of the document from the supplemental administrative record forecloses its ability to invoke RCFC 11(c)(2)'s safe harbor provision.

-20-

In sum, the court concludes that it possesses the authority to provide the relief requested by plaintiff in its motion for sanctions–i.e., attorney's fees and expenses–so long as the relevant violations of RCFC 11(b) are established.

## B.  Inherent Power

The court may also sanction misconduct under its inherent power to manage its affairs and ensure that the judicial process is not abused.  See Chambers, 501 U.S. at 43-46, 50; Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980); FRCP 11 note ("[Rule 11] does not inhibit the court . . . in exercising its inherent powers, or in imposing sanctions . . . ."); see also United Med. Supply Co. v. United States, 77 Fed. Cl. 257, 264 & n.6 (2007) (explaining that the Court of Federal Claims is vested with this inherent power).  However, the court's authority to sanction misconduct under its inherent power is not without limits.  Due to the broad scope of its inherent power, the court must exercise caution and restraint when invoking it to impose a sanction.  Chambers, 501 U.S. at 44, 50; Roadway Express, Inc., 447 U.S. at 764.  And, when considering the imposition of such a sanction, the court must "comply with the mandates of due process . . . ."  Chambers, 501 U.S. at 50.  In other words, the court must provide the party facing the possibility of a sanction with notice and an opportunity to respond.  Roadway Express, Inc., 447 U.S. at 767.

Another limit to the court's inherent power to sanction is unique to cases where the United States is the party facing sanctions.  In such cases, courts are prohibited from using their inherent power to impose monetary sanctions.  This prohibition is derived from the United States' sovereign immunity.  See United States v. Sherwood, 312 U.S. 584, 586 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued.").  A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  Because a court's inherent authority to impose sanctions is not, and by definition cannot be, unequivocally expressed in statutory text, it cannot provide the basis for imposing monetary sanctions against the United States.  See Tippett v. United States, 98 Fed. Cl. 171, 181 (2011) ("[T]he court cannot consider its inherent powers alone to be sufficient to overcome the sovereign immunity protecting the United States from claims for monetary contempt sanctions or litigation expenses."); see also Yancheng Baolong Biochem. Prods. Co. v. United States, 406 F.3d 1377, 1383 (Fed. Cir. 2005) ("The government's submission to the jurisdiction of the court alone is not sufficient to supply a waiver of sovereign immunity for the sanctions the court sought to impose.").  Accordingly, to the extent that monetary sanctions are appropriate in this case, they must be imposed under RCFC 11(c)(4), and not by means of the court's inherent powers.

### III.  DEFENDANT'S CONDUCT

#### A.  Defendant Engaged in Sanctionable Conduct

The court has identified five areas of concern for which sanctions could be appropriate: (1) the compilation of the supplemental administrative record; (2) the lack of evidentiary support in the supplemental administrative record for defendant's representation to the court that the EPA intended to issue a new or revised solicitation in the near future; (3) the lack of evidentiary support in the supplemental administrative record for defendant's representation to the court that sequestration played a role in the EPA's decision not to issue a new contract for soil remediation services; (4) the inclusion of an inaccurate, backdated document as part of the supplemental administrative record; and (5) the certification of the supplemental administrative record that included an inaccurate, backdated document.  In this section, the court describes the conduct at issue and indicates whether it will sanction that conduct.  In the section that then follows, the court discusses the appropriate sanctions.

#### 1.  Specific Issues Raised in the Show Cause Order

#### a.  Compilation of the Supplemental Administrative Record

In its show cause order, the court directed defendant to demonstrate its compliance with RCFC 11(b)(3), which requires that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"  Specifically, the court directed defendant to explain the evidentiary basis for the statements at issue and to provide supporting citations to the administrative record.  In its response to the show cause order, defendant explained that it could not provide supporting citations to the administrative record because the EPA did not memorialize the decisions regarding whether and when to issue a solicitation for a new soil remediation contract "in documents that would be included in a bid protest administrative record."  Def.'s Show Cause Resp. 2-3.  The court is baffled by this assertion.

Defendant's compilation of the supplemental administrative record was necessitated by plaintiff's filing of a supplemental complaint.  In its supplemental complaint, plaintiff challenged the EPA's decision to cancel the original procurement and the EPA's subsequent decision not to pursue a new contract for soil remediation services after indicating, via representations to the court, that it would be issuing a new solicitation to which plaintiff could respond.  Accordingly, to adequately address plaintiff's protest allegations, the supplemental administrative record should have included all of the documents relevant to the EPA's decision to cancel the original procurement and subsequent decision not to pursue a new soil remediation contract, including documents pertaining to the EPA's termination of its contract with PK and documentation of the role that sequestration played in its ultimate decision.  See RCFC 52.1(a) (explaining that an administrative record contains the record of relevant proceedings before an agency); Smith v. United States, 114 Fed. Cl. 691, 694 (2014) ("The administrative record to be considered by a

reviewing court shall include all the materials compiled by the agency before it made its decision."); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision."); see also Tauri Grp., LLC v. United States, 99 Fed. Cl. 475, 480-81 (2011) (noting that a request to supplement the administrative record with documents created during an agency's evaluation process is "a question of completing the administrative record, rather than supplementing it," and that the court's review of an agency's decision is to be based on "what the agency did in reaching its decision, not what [the agency] chooses to assemble after a protest is lodged"); Orion Int'l Techs. v. United States, 60 Fed. Cl. 338, 344 (2004) (noting that an administrative record may be insufficient if it lacks "information relied upon" by the agency); Murakami v. United States, 46 Fed. Cl. 731, 735 n. 4 (2000) (suggesting that "evidence that the agency considered but did not include in the record" should have been included in the administrative record filed with the court), aff'd, 398 F.3d 1342 (Fed. Cir. 2005).  To the extent that the EPA lacked formal documentation of the decisions it made that are relevant to this protest, as defendant contends, defendant should have sought to include in the administrative record informal documentation, such as handwritten notes or intra-agency communications, of the EPA's decision-making process.  See Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 353 n.3 (2013) (reflecting that the court directed the government to supplement the administrative record with electronic-mail messages relating to the evaluation of the protestor's proposal); Mont. Fish, Wildlife, & Parks Found., Inc. v. United States, 91 Fed. Cl. 434, 445-46 (2010) ("Information the contracting officers acquired, even if by informal means such as oral conversations, which was available at the time the decision was made . . . , should be reflected in the administrative record."); cf. Gulf Grp., Inc. v. United States, 61 Fed. Cl. 338, 347 (2004) (noting that the court did not permit discovery of internal agency communications because "the record already contained the final determinations of the relevant decisionmakers and the contemporaneous reasons they gave in support of [their] decisions").

Indeed, as reflected by the appendix submitted by defendant with its response to the show cause order, informal documentation of the EPA's decision-making process existed. Nevertheless, despite the allegations in plaintiff's supplemental complaint and the need for the court to have an adequate record to review the merits of plaintiff's protest, defendant did not include any of this informal documentation in the supplemental administrative record.  Thus, the record before the court lacked any documentation supporting (1) defendant's previous assertion that as of March 11, 2013, the EPA intended to issue a new or revised solicitation in the near future or (2) defendant's previous assertion, challenged by plaintiff, that sequestration affected the EPA's decision not to issue a new soil remediation contract.  For defendant to now imply that the informal documentation reflecting the bases for the EPA's decisions could not or should not have been included in the supplemental administrative record, is, at best, misguided.

Moreover, it bears noting that a party's obligation under RCFC 11(b)(3) to ensure that "factual contentions have evidentiary support" may be different in a bid protest than it would be in other cases.  The only evidence that a court may consider in a bid protest is the evidence contained in the administrative record.  See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d

-23-

1374, 1381 (Fed. Cir. 2009) ("The focus of judicial review of agency action remains the administrative record . . . ."). This suggests that the "evidentiary support" for factual contentions made by the government in a bid protest regarding an agency's decision-making process should be contained within the administrative record filed with the court. Here, the administrative record, as supplemented, did not contain documentation supporting defendant's factual contentions that the EPA intended to issue a new or revised solicitation in the near future and that sequestration played a role in the EPA's decision not to solicit a new contract for soil remediation services. And, defendant did not seek to supplement the administrative record with such information until April 11, 2014, more than nine and twelve months, respectively, after it made its factual contentions.

Despite the court's concerns with defendant's failure to include the necessary evidentiary support in the supplemental administrative record and defendant's extended delay in seeking to further supplement the administrative record with the relevant evidentiary support, the court will not impose any sanctions for this conduct because defendant has included the relevant documents in the corrected administrative record. However, in future bid protests, defendant shall take due care to ensure that the factual representations it makes to the court have evidentiary support in the administrative record.

### b. The EPA's Intent to Issue a New Solicitation in the Near Future

As described above, defendant represented in its March 11, 2013 motion to dismiss that the EPA intended to issue a new or revised solicitation in the near future, but the supplemental administrative record did not include any support for that statement. With its response to the show cause order, defendant produced extrarecord documentation reflecting that, as of March 11, 2013, the EPA did intend to issue a new or revised solicitation in the near future, and that the EPA changed course after defendant filed its motion to dismiss. Defendant should have included this extrarecord documentation in the supplemental administrative record. However, as noted above, because defendant has included this documentation in the corrected administrative record, the court will not impose sanctions for a violation of RCFC 11(b)(3).

### c. The Effect of Sequestration on the EPA's Decision Not to Solicit a New Contract

The other problematic factual contentions identified by the court in the show cause order concerned the effect of sequestration on the EPA's decision not to pursue a new contract for soil remediation services. In both its July 9, 2013 notice and its September 23, 2013 reply in support of its renewed motion to dismiss, defendant asserted that the EPA's decision was the result of the significant budget constraints caused by sequestration. However, the supplemental administrative record did not include any support for that contention.

With respect to its July 9, 2013 representation to the court, defendant produced extrarecord documentation with its response to the show cause order reflecting that the EPA had advised [former defense counsel] on July 8, 2013, that sequestration was a basis for the decision

not to issue a new soil remediation contract. Because the proffered documentation consists of electronic-mail messages between EPA employees and counsel, it was appropriate for defendant to withhold them from the supplemental administrative record. Nevertheless, defendant has included these messages in the corrected administrative record. And, there is nothing in the messages indicating that [former defense counsel] did not engage in a reasonable inquiry under the circumstances in violation of RCFC 11(b)(3). Thus, the court declines to sanction defendant for the July 9, 2013 representation to the court.

The circumstances surrounding defendant's second representation regarding sequestration are somewhat different. In its September 9, 2013 opposition to defendant's renewed motion to dismiss, plaintiff contended that sequestration could not have affected the EPA's decision not to issue a new contract because funding for the soil remediation work was not derived from current-year appropriations. In support of this contention, plaintiff provided documentation–a quotation from the invitation for bids included in the original administrative record and a copy of a page from the EPA's website–that funding for the work came from a bankruptcy settlement fund held in the "Superfund Trust." In its September 23, 2013 reply, defendant responded to plaintiff's contentions as follows:

> [Plaintiff] ignores basic principles of economics and logic. EPA has a finite amount of money to spend. That amount is markedly less as a result of sequestration. Every dollar out of the Superfund or appropriated funds[] is one dollar that it does not have to spend elsewhere. Long-term sequestration has forced EPA to take a hard look at its budget. It has determined that it can save money by satisfying its lead remediation needs under . . . existing contracts. The decision to do so was not irrational. [Plaintiff] suggests no authority suggesting that it was.

Def.'s Reply 11. In other words, despite the information contained in the invitation for bids and on the EPA's website regarding the funding source for the soil remediation work, defendant did not retract its assertion that sequestration was the basis for the EPA's decision. Moreover, defendant suggested that the funds from the Superfund Trust and other appropriated funds are fungible, and that, therefore, any savings realized by not spending funds from the Superfund Trust could be used to obtain goods or services that were normally paid for using other appropriated funds.

Defendant's response to plaintiff's sequestration-related averments is highly problematic under RCFC 11(b). [Former defense counsel] did not cite any evidentiary or legal support for the contention that funds from the Superfund Trust and other appropriated funds are fungible. In relying instead on "basic principles of economics and logic," id., [former defense counsel] effectively ignored the evidence in the administrative record and the documentation supplied by plaintiff, all available to him prior to the filing of the reply brief, that implied just the opposite–that the funds from the Superfund Trust set aside for the OLS could only be used to remediate the soil at the OLS. Indeed, when later asked about this specific issue, Dr. Drake

confirmed that there are no budget constraints for the soil remediation work at the OLS because that work is fully funded from a special, dedicated account.  Thus, based on these facts alone, the court has no option but to conclude that [former defense counsel] did not investigate plaintiff's sequestration-related averments before filing defendant's September 23, 2013 reply.

The court's conclusion is buttressed by the fact that the record before it is bereft of any documentation reflecting that defendant conducted an investigation regarding plaintiff's sequestration-related averments.  Specifically, there is no indication that [former defense counsel] performed his own investigation regarding the discrepancy between the information in the July 9, 2013 notice on one hand and the invitation for bids and the EPA website on the other hand; there is no indication that [former defense counsel] asked [agency counsel] to investigate the discrepancy; and, if [agency counsel] was aware of the contents of plaintiff's response brief, there is no indication that [agency counsel] initiated an investigation of the discrepancy.  These lapses are inexplicable–plaintiff had not advanced a wild, unsubstantiated argument.  Rather, plaintiff made a factual contention supported by evidence from both within, and outside of, the administrative record.  The contents of plaintiff's response brief should have prompted further inquiry by [former defense counsel]–he should have pressed his client to square its advice that sequestration had an impact on its ability to proceed with the soil remediation work with the information contained in the invitation for bids and on the EPA's website.  Therefore, defendant's September 23, 2013 contention regarding the role of sequestration in the EPA's decision violates RCFC 11(b)'s requirement that factual contentions be made after "an inquiry reasonable under the circumstances[.]"

Defendant's arguments to the contrary fall short.  According to defendant, [former defense counsel] was entitled to rely on the information supplied by [agency counsel] in July 2013 that was ultimately obtained from Ms. Thomas and Dr. Drake.  Defendant explained that this reliance is justified by the fact that Ms. Thomas truly understood that sequestration was the reason for the EPA's decision not to pursue a new soil remediation contract, especially in light of Dr. Drake's confirmation of this understanding and the guidance that she had been receiving from her superiors at the EPA regarding the effect of sequestration on EPA contracts.  However, Ms. Thomas's understanding in July 2013 has no bearing on defendant's obligation, when confronted with conflicting evidence two months later, to engage in further inquiry.[9]

---

[9]  Nevertheless, it bears noting that as the Acquisition Section Chief for EPA Region 7, Ms. Thomas presumably has oversight over all of the contracts issued in her region and, therefore, it stands to reason that Ms. Thomas would be familiar with the funding sources for each of these contracts.  Moreover, as noted by plaintiff, during the relevant time period, the funding source for the work being performed at the OLS was identified on the EPA's publicly available website.  Accordingly, it seems fair to assume that even if she had not read the invitation for bids for the soil remediation contract ultimately awarded to PK, Ms. Thomas would know that the work at issue was being funded from the Superfund Trust, and not from other appropriated funds.  However, there is no actual evidence before the court indicating that Ms. Thomas possessed this knowledge.  See, e.g., AR 2-121 (containing the invitation for bids, which

Moreover, defendant's argument that sequestration did, in fact, play a role in the EPA's decision not to issue a new soil remediation contract, as reflected by the documentation it submitted in the appendix attached to its response to the show cause order, is not persuasive. The documentation relied upon by defendant reflects that all of the EPA's components were under a mandate to decrease contract-related costs to accommodate the decrease in funding triggered by sequestration. However, with respect to the soil remediation services at issue in this protest, defendant's proffered documentation reflects that the EPA was continuously monitoring the number of properties that required remediation, and that sometime in May 2013, it had determined that a new soil remediation contract was unnecessary due to the lower-than-anticipated number of properties requiring remediation. In other words, it was the scope of the remaining work, and not funding for that work, that dictated the EPA's decision.

Ultimately, there is no evidence before the court indicating that the EPA chose not to solicit a new soil remediation contract for the OLS due to sequestration. Had defendant launched the inquiry mandated by RCFC 11(b) when plaintiff presented it with credible evidence in conflict with its July 9, 2013 representation to the court, it would have discovered this fact and, presumably, the incorrect factual contention regarding sequestration would not have appeared in its September 23, 2013 reply in support of its renewed motion to dismiss. Defendant's failure to investigate the effect of sequestration on the EPA's decision not to solicit a new soil remediation contract constitutes sanctionable conduct. However, upon careful reflection, the court declines to impose a sanction. Rather, it is confident that the foregoing discussion will be sufficient to deter further similar conduct by defendant and its legal representatives.

### 2. The Inaccurate, Backdated Document, and Its Inclusion in the Supplemental Administrative Record Filed With the Court

The final two, and most serious, areas of concern identified by the court relate to the inclusion of an inaccurate, backdated document in the supplemental administrative record and the subsequent certification of that record by the EPA. The information included in the appendix attached to defendant's response to the show cause order reveals the following course of events. In early January 2014, [agency counsel] advised Ms. Thomas that a supplemental administrative record addressing the new claim in plaintiff's supplemental complaint needed to be compiled. This information was subsequently passed on to Ms. Nero. In reviewing her files, Ms. Nero realized that she did not prepare a Determination and Findings document in March 2013 when the EPA terminated its contract with PK. Rather than admitting that she did not prepare the document required by Ms. Thomas, she attempted to cure her oversight by preparing, after consultation with Ms. Thomas, a draft Determination and Findings document. Paragraph 19 of the draft document indicated that the reasons for the EPA's termination of the contract with PK

---

does not contain any reference to Ms. Thomas), App. 115-16 (containing a memorandum that was sent to EPA program offices, and not contracting offices, confirming that Superfund remediation work was mission critical). Thus, the court will not attribute actual knowledge to her.

were (1) the costs being incurred by PK and, inaccurately, (2) that the EPA's soil remediation needs at the OLS could be satisfied under existing contracts. Ms. Nero forwarded the draft to Ms. Thomas on January 6, 2014. Ms. Thomas responded the following morning, recommending that Ms. Nero reverse the order of the two subparagraphs under paragraph 19 to reflect, inaccurately, that the primary reason for the termination was the EPA's ability to satisfy its soil remediation needs at the OLS through existing contracts. Ms. Nero made the suggested change and then signed and dated the document. Instead of hand-writing the then-current date–January 7, 2014–on the document, Ms. Nero backdated the document to March 11, 2013, which was consistent with what was typewritten in paragraph 19. This inaccurate, backdated document was then included in the supplemental administrative record, which Ms. Nero forwarded to counsel.[10] On January 31, 2014, due to Ms. Nero's absence from the office, Ms. Thomas was asked to review and certify the supplemental administrative record. Contrary to the language of the certification she signed, Ms. Thomas did not review the record; she merely assumed that the record was accurate and signed the certification. Later that day, Mr. Wolak filed the supplemental administrative record and Ms. Thomas's certification with the court.

The court draws several conclusions from the foregoing recitation of events. First, by backdating the Determination and Findings document in both paragraph 19 and alongside her signature, Ms. Nero was attempting to make it appear to anyone who read the document that she prepared and signed the document ten months earlier than she actually did. Ms. Nero knew that the document was going to be included in a supplemental administrative record that would be provided to counsel and filed with the court. It necessarily follows that by including the backdated document in the supplemental administrative record, Ms. Nero was intentionally trying to deceive counsel and the court regarding the authenticity of the document.

Second, Ms. Thomas's recommendation that Ms. Nero edit paragraph 19 of the draft Determination and Findings document demonstrates that Ms. Thomas had read, and understood the contents of, paragraph 19. Because paragraph 19 clearly indicated that the document had been prepared in March 2013, Ms. Thomas was either (1) knowingly, and improperly, editing a document that had been prepared in March 2013 or (2) knowingly participating in the creation of a document in January 2014 that should have been created in March 2013. Accordingly, Ms. Thomas was complicit in Ms. Nero's attempt to make it appear to anyone who read the document that it had been prepared ten months earlier than it was actually prepared. And, like Ms. Nero, Ms. Thomas knew that the document was going to be included in a supplemental administrative record that would be provided to counsel and filed with the court. Accordingly, it follows that by approving the document, Ms. Thomas was intentionally trying to deceive counsel and the court regarding its authenticity.

---

[10] Ms. Thomas states that Ms. Nero forwarded the supplemental administrative record to EPA and DOJ counsel via electronic mail, but the relevant electronic-mail messages are not part of the record before the court.

Third, as admitted by Ms. Nero and Ms. Thomas, the backdated Determination and Findings document contained inaccurate information concerning why the EPA terminated its contract with PK–i.e., that the contract termination was the result of the EPA being able to satisfy its soil remediation needs through existing contracts.  Ms. Nero bears some responsibility for including the erroneous information in the document because she did so without having any documentation indicating that the PK contract was terminated due to the changed needs of the EPA.  Her responsibility is not excused by her extended absence from the office because, as the contracting officer and the individual signing the document, she had the obligation to ensure the accuracy of the document's contents.  Ms. Thomas also bears some responsibility for including the erroneous information in the document because she reviewed the document and expressly confirmed that the EPA's changed needs was one of the two reasons for the termination of the contract with PK, despite any documentary support for that reason.  Her express approval of this erroneous information renders her subsequent explanation that she "completely missed" it during her review disingenuous, at best.

Fourth, Ms. Thomas falsely represented in her certification of the supplemental administrative record that she carefully reviewed the record and that, as indicated by her careful review, the record constituted the record of the actions taken by the EPA that were relevant to plaintiff's protest.  Ms. Thomas admits in her declaration that she did not review the supplemental administrative record.  And, as set forth above, Ms. Thomas knew, or should have known, that the supplemental administrative record contained an inaccurate, backdated document.  Moreover, Ms. Thomas executed the certification with the knowledge that the supplemental administrative record would be filed with the court.

Based on these conclusions, the court finds that Ms. Nero and Ms. Thomas acted in bad faith in preparing and approving the inaccurate, backdated Determination and Findings document, and in including that inaccurate, backdated document as part of the supplemental administrative record that they knew would be filed with the court.  Moreover, the court finds that Ms. Thomas acted in bad faith by falsely certifying that she carefully reviewed the supplemental administrative record and that the record was an accurate representation of the EPA's actions relevant to the protest.

## B. Appropriate Sanctions

As described above, the court has concluded that the following conduct should be sanctioned:  (1) Ms. Nero's and Ms. Thomas's preparation of an inaccurate, backdated document and their subsequent inclusion of that document in the supplemental administrative record; and (2) Ms. Thomas's certification of the supplemental administrative record.  The court must therefore determine what sanctions are appropriate for this misconduct.

The misconduct of Ms. Nero and Ms. Thomas is sanctionable under both RCFC 11 and the court's inherent powers.  Specifically, a number of federal appeals courts have upheld Rule 11 sanctions against represented parties who submitted manufactured evidence to the court.  See,

e.g., Jimenez v. Madison Area Tech. Coll., 321 F.3d 652, 655-57 (7th Cir. 2003) (finding no abuse of discretion in the trial court's imposition of Rule 11 sanctions against a represented party who presented fraudulent documents to support the allegations in her complaint); Pope v. Fed. Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (finding no abuse of discretion in the trial court's imposition of Rule 11 sanctions against a represented party who produced a manufactured document as an exhibit "with intent to mislead the court"); Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991) (noting that both Rule 11 and the court's inherent powers can be the basis for sanctions for a represented party's falsification of a deposition, and that "collusion with counsel" was not a prerequisite for such sanctions); see also Fraige v. Am.-Nat'l Watermattress Corp., 996 F.2d 295, 296 & n.1 (Fed. Cir. 1993) (remarking that the trial court had imposed Rule 11 sanctions against the defendant for its president's submission of false and forged documents to the court to bolster the defendant's opposition to a motion for a preliminary injunction).  Federal appeals courts have also held that the submission of falsified evidence–both documentary and testimonial–to the court is sanctionable under the court's inherent powers.  See, e.g., Oliver v. Gramley, 200 F.3d 465, 466 (7th Cir. 1999) (affirming the district court's dismissal of a petition for habeas corpus as a sanction for the petitioner's submission to the court of a perjurious affidavit and a forged certificate of service, an action that the appeals court characterized as "criminal in character," "egregious, inexcusable, and destructive"); Gonzalez v. Trinity Marine Grp., Inc., 117 F.3d 894, 898-99 (5th Cir. 1997) (affirming the district court's conclusion that the alteration and fabrication of evidence–an audio recording–was conduct that could be sanctioned under the court's inherent powers); TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 915-17 (9th Cir. 1987) (per curiam) (affirming the trial court's imposition of sanctions for the defendant's perjured deposition testimony, which "qualifie[d] as a willful deceit of the court").

The court has concluded that Ms. Nero and Ms. Thomas acted in bad faith when they prepared a Determination and Findings document, and subsequently included that document in the supplemental administrative record, with the knowledge that the document was backdated and contained inaccurate information, and with the further knowledge that the supplemental administrative record would be used in proceedings in the Court of Federal Claims.  The court has also concluded that Ms. Thomas acted in bad faith by representing in her certification of the supplemental administrative record that she carefully reviewed the record and that the record constituted the record of the actions taken by the EPA that were relevant to plaintiff's protest, because she acknowledged that she did not review the record and because the record contained an inaccurate, backdated document.

The bad faith conduct of Ms. Nero and Ms. Thomas caused plaintiff's counsel, defense counsel, and the court to question the integrity of the administrative record compiled by the EPA.  Given that one document was created ten months after the fact for the purposes of litigation, could it be that other documents were similarly created for the purposes of litigation?  Does the false certification of one part of the administrative record call into question the authenticity of the certification of the rest of the administrative record?  The resulting investigation into these questions, and the subsequent efforts to address and resolve the issues raised by that

investigation, required the expenditure of significant resources–both time and money–by counsel and the court.  These were resources that could have been devoted to addressing the merits of the protest or devoted to work on matters unrelated to this protest.  In sum, there is no question that the actions of Ms. Nero and Ms. Thomas had significant adverse consequences in this protest.

As previously stated, RCFC 11(c)(4) provides that sanctions are meant to deter future misconduct.  Deterrence is particularly important in this case due to the presumption that federal government contracting officials perform their duties in good faith.  See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (holding that a contractor was unable to "overcome the strong presumption that government contract officials exercise their duties in good faith"); accord U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001) (noting that "a presumption of regularity attaches to the actions of Government agencies"); Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (en banc) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.'" (citation omitted) (quoting Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993))).  That presumption is overcome when contracting officials take actions similar to those taken by Ms. Nero and Ms. Thomas in this case, i.e., preparing a backdated, inaccurate document; including that document in the supplemental administrative record; and then certifying the integrity of the record.  One of the court's goals in sanctioning the bad faith conduct of the contracting officer and her supervisor in this case is to deter further similar misconduct by contracting officials.

Based on the severity of Ms. Nero's and Ms. Thomas's misconduct, the court concludes that under RCFC 11(c)(4), the EPA should reimburse plaintiff for the reasonable attorney's fees and expenses it incurred to address that conduct, beginning on March 6, 2014, the date that Mr. Wolak advised plaintiff's counsel that there might be an issue with the Determination and Findings document, and ending on June 12, 2014, the date that plaintiff filed its brief regarding the court's inherent power to impose sanctions.[11]  In addition, due to the resources expended by the court in addressing the issues raised by the inaccurate, backdated document and false certification that defendant filed with the court, the court concludes that, as permitted by RCFC 11(c)(4), the EPA should pay a monetary penalty to the court of $1,000.  These sanctions are the least severe sanctions that would deter further similar misconduct by Ms. Nero, Ms. Thomas, other EPA personnel, and other contracting officials.

## IV.  CONCLUSION

For the reasons set forth above, the court concludes that (1) Ms. Nero's and Ms. Thomas's bad faith preparation of an inaccurate, backdated document that they subsequently included, in bad faith, in the supplemental administrative record; and (2) Ms. Thomas's bad faith

---

[11]  This award does not include the attorney's fees and costs that plaintiff incurred in preparing and filing its procedurally deficient motion for sanctions.

certification of the supplemental administrative record should be sanctioned.  It therefore **GRANTS IN PART** plaintiff's second motion for sanctions and imposes the following sanctions:

- The EPA shall reimburse plaintiff for the reasonable attorney's fees and costs it incurred, from March 6, 2014, to June 12, 2014, in addressing the bad faith conduct concerning the inaccurate, backdated Determination and Findings document and the falsified certification of the supplemental administrative record.

- The EPA shall pay a penalty to the court of $1,000.

Plaintiff shall prepare a statement of the attorney's fees and costs that it believes should be reimbursed and then, by **no later than Friday, September 5, 2014**, file the statement, along with any necessary explanation or supporting documentation, with the court.  Defendant shall then file any objections to the reasonableness or accuracy of plaintiff's claimed attorney's fees and costs by **no later than Friday, September 19, 2014**.  In addition, the EPA shall pay its penalty to the court by **no later than Friday, October 3, 2014**.  The payment shall be made by certified or cashier's check made payable to "Clerk, U.S. Court of Federal Claims."

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, August 22, 2014**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge