# In the United States Court of Federal Claims

No. 13-71C
(Filed Under Seal: August 13, 2014)
(Reissued for Publication: August 25, 2014)[*]

| | |
|---|---|
| COASTAL ENVIRONMENTAL GROUP, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Bid Protest; Motion to Dismiss; Standing; Cross-Motions for Judgment on the Administrative Record; Constructive Cancellation of a Procurement; Rational Basis; Presumption of Good Faith |

Brian W. Craver, Washington, DC, for plaintiff.

Devin A. Wolak, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

In this bid protest, plaintiff Coastal Environmental Group, Inc. challenges the purported cancellation of a soil remediation procurement and seeks judgment on the administrative record. Defendant moves to dismiss plaintiff's protest for lack of standing and seeks, in the alternative, judgment on the administrative record. As explained more fully below, the court concludes that plaintiff has standing to pursue its protest, but that plaintiff's protest fails on its merits. Accordingly, the court denies defendant's motion to dismiss and plaintiff's motion for judgment on the administrative record, and grants defendant's cross-motion for judgment on the administrative record.

[*] The court provided the parties with an opportunity to suggest redactions to this ruling, but in an August 22, 2014 joint status report, they indicated that no redactions were necessary.

# I. BACKGROUND

## A. Invitation for Bids and Contract Award

The Omaha Lead Site is a residential area in Omaha, Nebraska where the soil was contaminated by air emissions from nearby lead smelting and refining operations.[1] AR 103. The United States Environmental Protection Agency ("EPA"), with the assistance of the Nebraska Department of Environmental Quality, is responsible for remediating the soil on the residential properties comprising the site. Id.

By early 2012, the EPA had entered into over forty contracts related to the remediation of the soil at the Omaha Lead Site, id. at 129, but its work was not complete. Indeed, the EPA had identified approximately 5,000 properties that still required remediation. Id. at 155, 161. Thus, the EPA decided to invite bids for two soil remediation contracts. Id. at 126, 129, 151, 161. One of the contracts was to be set aside for a small business, id. at 126, 151, 159, and the other was to be set aside for a section 8(a) small business, id. at 3, 70, 126.

With respect to the latter contract, the EPA, on March 29, 2012, issued solicitation SOL-R7-12-00016,[2] an invitation for bids ("IFB") to remediate the soil on as many as 2,600 residential properties at the Omaha Lead Site.[3] Id. at 2-3, 9-16, 137. The EPA contemplated awarding an indefinite-quantity/fixed-price contract to the lowest bidder who was deemed to be responsible and who submitted a responsive bid. Id. at 69, 71. The base period of the contract was to be one year, followed by three one-year option periods. Id. at 9-18. Bidders were required to submit, among other materials, resumes for key personnel that reflected the specific experience identified in the IFB. Id. at 67-68. The EPA cautioned that bids not conforming to the "essential

[1] The court derives the facts in the background section from the corrected administrative record filed on May 22, 2014 ("AR").

[2] The solicitation for the contract set aside for a small business was solicitation SOL-R7-12-00005. AR 151.

[3] The administrative record and the parties are inconsistent in referring to the maximum number of properties encompassed by this IFB–there are references to both 2,600 and 2,400 properties. Under the contract that resulted from the IFB, a maximum of 700 properties could be remediated during the base period; these properties were divided among six fixed-price contract line items. AR 463. The first and second option periods were set up the same way. Id. at 465, 468. However, the contract only allowed for the remediation of a maximum of 500 properties during the third option year–300 properties by way of three fixed-price contract line items and 200 properties by way of indefinite-quantity contract line items. Id. at 470. Accordingly, there was a maximum of 2,400 properties to be remediated under fixed-price contract line items and a maximum of 2,600 properties to be remediated under all contract line items. This distinction may account for the discrepancies in the administrative record and the parties' briefs.

requirements" of the IFB would be rejected. Id. at 68. The EPA also provided that bidders were required to keep their bids open for ninety days from the date the bids were due. Id. at 69. Bids were due by May 8, 2012. Id. at 177.

Eight companies submitted bids, including plaintiff and PK Management Group, Inc. ("PK"). Id. at 181-412, 588-775. PK was the low bidder, with a total bid price of $23,897,255. Id. at 412. Plaintiff, with a total bid price of $26,774,907, was the next lowest bidder. Id. PK's bid contained two different bid acceptance periods. On the standard "Solicitation, Offer and Award" form included with its bid, PK indicated, by not filling in a number on the blank in Box 12, that its offer would remain open for sixty days.[4] See id. at 406; accord id. at 1588 (indicating the contracting officer's understanding that PK left its offer open for sixty days). However, in the "Minimum Bid Acceptance Period" clause of its bid, PK indicated that it would leave its bid open for ninety days. Id. at 410. Similarly, plaintiff's bid contained two different bid acceptance periods. On the standard "Solicitation, Offer and Award" form included with its bid, plaintiff indicated that it would leave its bid open for sixty days by writing "60" on the blank in Box 12. Id. at 592. However, like PK, plaintiff indicated that it would leave its bid open for ninety days in the "Minimum Bid Acceptance Period" clause of its bid. Id. at 597.

Before the EPA could award the contract to PK, the low bidder, it needed to review PK's bid to ensure that it met the requirements of the IFB. The contract-level contracting officer, Pauletta France-Isetts, conducted this review and concluded that PK did not meet the IFB's requirements because it lacked relevant experience and the resumes of its key personnel did not reflect the required experience. Id. at 413-14. Ms. France-Isetts prepared a memorandum for the administrative contracting officer, Yolanda Nero, describing her findings. Id. at 413-18. Ms. Nero treated Ms. France-Isetts's conclusion as a finding that PK was not a responsible bidder. Id. at 419.

Because the contract was set aside for a section 8(a) small business, the EPA was required to refer the issue of PK's responsibility to the United States Small Business Administration ("SBA") for evaluation in the SBA's Certificate of Competency program. See 15 U.S.C. § 637(b)(7)(A) (2012); 13 C.F.R. § 125.5 (2012). In the referral, Ms. Nero did not address whether PK submitted a responsive bid. AR 419-22. On June 22, 2012, the SBA issued a Certificate of Competency to PK and notified the EPA that it considered PK to be a responsible bidder. Id. at 435-36. The SBA further advised the EPA that it was required to award the contract to PK. Id. at 435. Dissatisfied with that outcome, Ms. Nero filed an appeal with the SBA, but did so without addressing the responsiveness of PK's bid. Id. at 441. The SBA denied the appeal. Id. at 446-56. Accordingly, Ms. Nero awarded the contract to PK on September 26, 2012, id. at 457, more than ninety days after bids were due, id. at 177, 457. The following day,

[4] The standard "Solicitation, Offer and Award" form provides a blank space for the offeror to write in the number of calendar days that it will keep its offer open, and indicates that the default bid acceptance period is sixty days "unless a different period is inserted by the offeror . . . ." See, e.g., AR 406.

Ms. Nero notified the other bidders that their bids were not accepted and that the contract had been awarded to PK. Id. at 513.

### B. Plaintiff's Protests

Shortly after contract award, plaintiff protested the EPA's award decision at the Government Accountability Office ("GAO"), arguing that PK's bid was nonresponsive and that PK was not a responsible bidder. Id. at 523-34, 550-58, 570-76. The GAO ultimately denied the protest. Id. at 581-87.

Plaintiff opted to pursue its protest in the United States Court of Federal Claims ("Court of Federal Claims"). In its January 29, 2013 complaint, plaintiff set forth two claims for relief. First, it alleged that the EPA's award of the contract to a bidder with a nonresponsive bid was arbitrary and capricious. Compl. ¶¶ 19-23. Second, it contended that the SBA's determination that PK was a responsible bidder in the absence of any finding that PK submitted a responsive bid was arbitrary and capricious. Id. ¶¶ 24-27. Plaintiff sought the following relief: (1) an injunction forbidding further performance of the contract; (2) a declaration that the contract awarded to PK was null and void; (3) termination of the contract; (4) an injunction requiring that the contract be awarded to plaintiff as the next lowest bidder; (5) attorney's fees and costs; and (6) any other relief deemed just and equitable. Id. at 9-10.

### C. The EPA's Termination of Its Contract With PK

During the status conference conducted by the court the day after plaintiff filed its protest, defendant represented that the EPA would agree to stay PK's performance of the contract pending an expedited ruling from the court on the merits of plaintiff's protest. However, even with an expedited briefing schedule, the delay in commencing contract performance was imposing a financial burden on PK. AR 1148-51, 1443, 1586. PK discussed this issue with the EPA during a series of telephone calls from February 19 to February 25, 2013, during which the EPA proposed terminating the contract for convenience at no cost to the government. Id. at 1148-51. The EPA was willing to proceed with such a termination because, as noted in a February 15, 2013 electronic-mail exchange, it would be able to "protect the funds" designated for the PK contract and use them for another contract, with every effort to be made to have a "new contract" awarded by April 2013.[5] Id. at 1443; see also id. at 1444-45 (setting up, on March 1, 2013, a conference call to discuss a "new contract" to replace the PK contract), 1449 (anticipating, on March 8, 2013, a new soil remediation contract to replace the PK contract).

In the meantime, proceedings in this protest continued, and plaintiff filed a motion for judgment on the administrative record. But then, just before its response and cross-motion were

---

[5] Contrary to defendant's interpretation of this electronic-mail exchange, see Def.'s Mot. 8, the EPA did not specify that there would be a new procurement, AR 1443. Rather, it only indicated that there would be a new contract award. Id.

due, defendant filed a notice with the court indicating that the EPA intended to terminate its contract with PK for its convenience, conclude the procurement, and then reassess its needs for the soil remediation work that was the subject of the procurement. Notice, Mar. 5, 2013, at 1-2. Consequently, defendant stated that it intended to move to dismiss the protest as moot. Id. The EPA terminated its contract with PK on March 11, 2013, AR 1161, and defendant filed its motion to dismiss this protest that same day.

**D. The EPA's Reassessment of Its Soil Remediation Needs and Decision Not to Pursue Another Soil Remediation Contract**

When the EPA realized that its contract with PK would be terminated, it recognized a need to award a new soil remediation contract. Id. at 1443-45, 1449. However, there is no indication that it considered returning to the original procurement to award the contract to the next lowest bidder, i.e., plaintiff. Instead, the EPA began to make alternative arrangements for satisfying its soil remediation needs at the Omaha Lead Site. Initially, it intended to procure the soil remediation services using a new solicitation. See id. at 1446 (containing a March 5, 2013 electronic-mail message from Ms. Nero to agency counsel, which was subsequently forwarded to defense counsel, indicating that Ms. Nero was "going to have to reprocure another contract" and was "planning on putting another solicitation out on the streets"), 1450-53 (discussing, on March 6 and 8, 2013, a possible schedule for issuing a new solicitation to procure a replacement soil remediation contract). This plan was to be discussed during a March 8, 2013 conference call. Id. at 1452-53.

In preparation for the conference call, an EPA employee–presumably David Drake, Ph.D., chief of the Special Emphasis Remedial Section for EPA Region 7–prepared a one-page briefing paper regarding the then-current situation at the Omaha Lead Site.[6] Id. at 1458. In that briefing paper, Dr. Drake indicated that there were 660 properties awaiting remediation and 1,900 properties for which the EPA needed to secure access and sample the soil. Id. Dr. Drake accordingly recommended that the EPA "[d]elay issuing a new soil remediation contract . . . and continue to focus on securing access and completing sampling." Id. He believed that the existing contract with Lawson Environmental Service, LLC ("Lawson") might be sufficient to accommodate the EPA's soil remediation needs,[7] and that if it was not, the EPA could solicit a new contract when necessary. Id.; accord id. at 1456 ("I believe we should delay issuing a new

---

[6] Although the briefing paper does not contain the name of its author, the contents of a March 8, 2013 electronic-mail message sent by Dr. Drake suggest that he prepared it. See AR 1455.

[7] It appears that the Lawson contract was the contract set aside for a small business described in solicitation SOL-R7-12-00005, the companion to the solicitation at issue in this protest. Compare AR 457 (indicating that PK was awarded contract number EP-S7-12-07 on September 26, 2012), with id. at 1092 (indicating that Lawson was awarded contract number EP-S7-12-06 on September 26, 2012).

contract at this time. We may not ultimately have sufficient properties for a second contract or could need a much smaller future contract than originally anticipated.").

Despite Dr. Drake's recommendation, the EPA decided after the conference call to proceed with a new soil remediation procurement. Id. at 1461 ("We will be proceeding with a Best Value procurement for Omaha . . . . In addition, a small access agreement contract will be procured . . . ."). It commenced the preparation of a solicitation for the procurement. See id. at 1462-63 (discussing, on March 8, 2013, possible evaluation criteria for the new soil remediation procurement); 1474 (indicating, on April 10, 2013, that Ms. France-Isetts was beginning to work on the soil remediation contract). However, the EPA also began to rethink its need for a new soil remediation contract. See id. at 1477 (indicating, on May 16, 2013, that the EPA was "still determining" whether it wanted to "rescope" the requirement).

Ultimately, on May 21, 2013, the EPA decided that it would not solicit a new soil remediation contract. See generally id. at 1481-86. It had determined that only 182 properties were ready for soil remediation work and that the greater need was for securing property access agreements–such agreements were needed for 2,317 properties. Id. at 1163, 1481. The EPA therefore decided to give the 182 properties requiring soil remediation to Lawson and divide the properties requiring access agreements between the City of Omaha and a new contractor. Id. at 1481. Accordingly, on June 10, 2013, the EPA initiated a new procurement limited to the securing of property access agreements. Id. at 1164-65. The EPA planned to conduct a sole-source procurement and award the contract–set aside for a section 8(a) small business and valued at $800,000–to Prudent Technologies, Inc. ("Prudent"). Id. at 1164-65, 1176, 1195. The EPA's decision to pursue this alternative course of action was explained by Dr. Drake in a July 24, 2013 electronic-mail message:

> The initial contract with P.K. Management was for $24.6 million and included the remediation of 2,400 residential properties over a four year period.
>
> We did not have this number of properties to remediate when the contract was proposed but believed that our ongoing sampling efforts would yield a sufficient number of properties to remediate. All of the residential properties we test do not require remediation so we can only estimate the number of properties that will ultimately require remediation since they all have not been tested.
>
> Our property testing activities during the P.K. contracting delay did not generate as many properties to remediate as we had anticipated so we re-assessed our needs for a second remediation contractor and now believe that the existing Lawson contract which is also for four years with a total of 2,400 properties may be sufficient to finish the work. However, we will not know for certain until all of the properties are tested so that is why we now need a new soil testing contract.

> . . . . After this work is complete we will then be able to definitely determine if the existing Lawson contract is sufficient. We may need a future soil remediation contract to finish the work but it is impossible to know this or determine the scope until all of the residential properties have been tested.

Id. at 1209. The EPA ultimately awarded the contract for securing property access agreements to Prudent on August 27, 2013. Id. at 1213.

**E. Further Proceedings in the Court of Federal Claims**

In the meantime, proceedings related to defendant's motion to dismiss continued in this court. On July 20, 2013, the court directed the parties to file supplemental briefs addressing the contents of a notice filed by defendant the previous day. Rather than filing a supplemental brief, defendant filed a renewed motion to dismiss. Shortly after the conclusion of briefing on the renewed motion to dismiss, proceedings in the protest were stayed for twenty-three days at defendant's request.[8] Subsequently, plaintiff moved for leave to file an amended complaint to add a claim challenging the EPA's purported cancellation of the soil remediation procurement.

On December 16, 2013, after the conclusion of all briefing, the court issued a decision resolving defendant's motion to dismiss, defendant's renewed motion to dismiss, and plaintiff's motion to amend its complaint. Coastal Envtl. Grp., Inc. v. United States, 114 Fed. Cl. 124 (2013). The court granted defendant's motions, holding that the two claims for relief set forth in plaintiff's complaint were moot. Id. at 130-32, 135. However, the court also granted plaintiff's motion, allowing plaintiff to file a supplemental complaint. Id. at 132-35.

Plaintiff filed its supplemental complaint shortly thereafter, adding a third claim for relief–captioned "Bad Faith Cancellation of the Procurement"–to challenge the EPA's purported cancellation of the original procurement, i.e., the procurement that resulted in the award of the contract to PK. Supplemental Compl. ¶¶ 28-40. Plaintiff seeks the following relief: (1) a declaration that the EPA violated statute and regulation in awarding the contract to PK; (2) a declaration that the EPA's cancellation of the soil remediation procurement violated the law because it was done in bad faith, without a compelling reason or rational basis; (3) an injunction enjoining the procurement of soil remediation services by any means other than through the procurement that was cancelled; (4) attorney's fees and costs; and (5) any other relief deemed just and equitable. Id. at 14-15.

Defendant subsequently filed a supplemental administrative record to add documents relevant to plaintiff's new claim for relief. Proceedings regarding the supplemental administrative record and the parties' requests to further supplement the administrative record

---

[8] Defendant requested the stay due to the lapse of appropriations to the United States Department of Justice. Although the lapse commenced on October 1, 2013, defendant did not move to stay proceedings until October 7, 2013. The court lifted the stay on October 29, 2013.

lasted several months, and are described more fully in a contemporaneously filed decision sanctioning the EPA for the misconduct of its contracting officials. See Coastal Envtl. Grp., Inc. v. United States, No. 13-71C, slip op. (Aug. 13, 2014). Ultimately, defendant filed a corrected administrative record on May 22, 2014. Plaintiff filed its motion for judgment on the administrative record on July 9, 2014, and defendant filed its motion to dismiss and cross-motion for judgment on the administrative record on July 31, 2014. Upon the conclusion of briefing, the court heard argument, and is now prepared to rule.

## II. DEFENDANT'S MOTION TO DISMISS

Defendant first moves to dismiss plaintiff's protest for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that plaintiff lacks standing to pursue its protest. "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). Without standing, a litigant's dispute is not justiciable. Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question"). The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter. Powell v. McCormack, 395 U.S. 486, 512 (1969); Baker v. Carr, 369 U.S. 186, 198 (1962); Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 n.3 (Fed. Cir. 2008); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993). In other words, the court may find that it possesses jurisdiction over the subject matter of a case but that the dispute is nevertheless nonjusticiable. Thus, while standing is jurisdictional in that it involves the court's power to adjudicate a case,[9] an RCFC 12(b)(1) motion may not be the appropriate vehicle by

---

[9] See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-10 (1988) (characterizing the justiciability issue of standing as a jurisdictional issue); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").

which to dismiss a case for lack of standing.[10]  Ultimately, however, the precise nature of the motion filed by defendant is not relevant here because plaintiff has standing to protest.

"The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Under section 1491(b)(1), bid protests may only be brought by "interested parties." The term "interested party" is construed in accordance with the Competition in Contracting Act of 1984, and, accordingly, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (interpreting this standard as requiring a protestor to show that it was an interested party prejudiced by the procuring agency's action and holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"); Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (defining "prejudice" as "injury"). Therefore, a party lodging a protest must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction").

Conceding, as it must, that plaintiff was an actual bidder in the procurement at issue, defendant's argument pertains only to the second prong of the standing test–direct economic interest. To prove that it possesses a "direct economic interest," a protestor must show that it had a "substantial chance" of being awarded the contract. Rex Serv. Corp., 448 F.3d at 1307. In other words, "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' . . . ." Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). According to defendant, plaintiff did not have a substantial chance of being awarded the contract because it submitted a nonresponsive bid, i.e., a bid that was only left open for sixty days and not the ninety days required by the IFB. The court does not find defendant's argument persuasive.

---

[10] See, e.g., Baker, 369 U.S. at 196 (holding that a case that is "unsuited to judicial inquiry or adjustment" should be dismissed for "a failure to state a justiciable cause of action" and not for "a lack of jurisdiction of the subject matter" (internal quotation marks omitted)); Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (noting that when "a plaintiff makes a claim that is not justiciable . . . a court should dismiss the case for failure to state a claim" and that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction"); see also Kontrick v. Ryan, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").


As defendant notes, plaintiff's bid included both sixty-day and ninety-day bid acceptance periods. Citing a decision from the GAO, defendant asserts that a bid containing conflicting acceptance periods is ambiguous and therefore nonresponsive. See Sundt Corp., B-274203, 96-2 CPD ¶ 171 (Comp. Gen. Nov. 5, 1996). However, defendant disregards the fact that the bid acceptance period portion of the standard "Solicitation, Offer and Award" form indicates on its face that it is not applicable if the solicitation includes the "Minimum Bid Acceptance Period" clause. See, e.g., AR 406. Thus, this case is unlike Sundt Corp., which concerned a different form that did not indicate that the bid acceptance period designated on the form would be rendered inapplicable by the inclusion of the "Minimum Bid Acceptance Period" clause in the solicitation. Because the form completed by plaintiff indicated that the "Minimum Bid Acceptance Period" clause was controlling, plaintiff's designation of a sixty-day bid acceptance period on that form is of no import. Accordingly, plaintiff's bid must be read to include only a ninety-day bid acceptance period. It therefore was not ambiguous or nonresponsive for this reason.

Furthermore, it is clear from its conduct that the EPA would not have considered plaintiff's bid to be ambiguous or nonresponsive for containing purportedly conflicting bid acceptance periods because it awarded the contract to PK, notwithstanding the fact that PK's bid contained the exact same sixty/ninety-day acceptance period dichotomy. Logic dictates that if such a dichotomy is not considered to be a fatal flaw for one bidder, then that same flaw cannot be fatal for any other bidder. Defendant does not provide a reason for applying a different standard within the same procurement–because, simply put, there is none. Thus, had the EPA not awarded the contract to PK, plaintiff, as the second low bidder, would have had a substantial chance of being awarded the contract. Plaintiff therefore has standing to protest.

## III. CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The parties have each filed a motion for judgment on the administrative record pursuant to RCFC 52.1, urging the court to enter judgment in its favor. In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[11]). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, Inc., 404 F.3d at 1356.

[11] The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1 was designed to incorporate the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

**A. Bid Protest Standard of Review**

In a bid protest, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4) (2012). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332).

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332 (internal quotation marks omitted). Thus, when a protestor challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, Inc., 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

**B. Discussion**

Plaintiff contends that the EPA cancelled the original soil remediation procurement in early March 2013 when it decided, upon the termination of its contract with PK, not to seek the revival of any of the existing bids and to instead solicit a new soil remediation contract. Plaintiff challenges this purported cancellation on three general grounds. First, plaintiff argues that the corrected administrative record does not contain any explanation for the EPA's decision to solicit a new contract instead of seeking the revival of an earlier bid, which forecloses a determination that the decision had a rational basis. Second, plaintiff contends that the purported cancellation was irrational because it occurred before the EPA reassessed its soil remediation needs. Third, plaintiff argues that by cancelling the procurement, the EPA did not treat all bidders equally and impartially, asserting that the EPA permitted PK to extend its bid acceptance period to allow for the initial award of the contract, but failed to ask plaintiff to extend its bid acceptance period to allow for the award of a contract to replace PK's terminated contract.

**1. The EPA Constructively Cancelled the Procurement**

The threshold issue implicated by plaintiff's contentions is whether the EPA's decision to solicit a new soil remediation contract instead of seeking the revival of an earlier bid constitutes the cancellation of the procurement. The starting point for the court's analysis are the provisions of the Federal Acquisition Regulation ("FAR") concerning sealed bid procurements. Under FAR 14.404-1(a)(1), after opening the bids but before awarding a contract, an agency may reject all of the bids and cancel the IFB if there is a "compelling reason" to do so. More particularly:

> Invitations may be cancelled and all bids rejected before award but after opening when . . . the agency head determines in writing that–
>
> (1) Inadequate or ambiguous specifications were cited in the invitation;
>
> (2) Specifications have been revised;
>
> (3) The supplies or services being contracted for are no longer required;
>
> (4) The invitation did not provide for consideration of all factors of cost to the Government . . .;
>
> (5) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that for which the bids were invited;
>
> (6) All otherwise acceptable bids received are at unreasonable prices, or only one bid is received and the contracting officer cannot determine the reasonableness of the bid price;
>
> (7) The bids were not independently arrived at in open competition, were collusive, or were submitted in bad faith . . .;
>
> (8) No responsive bid has been received from a responsible bidder;
>
> (9) A cost comparison . . . shows that performance by the Government is more economical; or
>
> (10) For other reasons, cancellation is clearly in the public's interest.

FAR 14.404-1(c). As is evident by the provision's plain language, the EPA's purported decision to cancel the procurement does not fit within the four corners of FAR 14.404-1 because the EPA

made the decision after contract award, did not expressly reject all of the bids,[12] and did not determine, in writing, that there was a compelling reason to reject all of the bids and cancel the IFB.[13]

The inapplicability of FAR 14.404-1, however, does not preclude the possibility that a sealed bid procurement has been cancelled. The GAO has concluded that when a procuring agency allows all bids to expire without awarding a contract, the agency has constructively cancelled the procurement. See Adrian Supply Co., B-240871 et al., 90-2 CPD ¶ 515 (Comp. Gen. Dec. 21, 1990); U.S. Rentals, 69 Comp. Gen. 395 (1990). That the GAO's decisions are distinguishable on their facts does not render the concept of constructive cancellation irrelevant in this protest.

As reflected in the corrected administrative record, the EPA invited bids for soil remediation services, opened the bids that it received, and awarded the contract to PK. Plaintiff immediately protested the EPA's contract award decision, first before the GAO and then in this court. During the pendency of this protest, PK determined that the financial burden of the delay in commencing contract performance was heavier than it could bear. Thus, the EPA and PK agreed to terminate their contract for convenience at no cost to the government. At the same time, the EPA decided to replace its contract with PK by issuing a new solicitation. Indeed, the EPA began to act on this decision after the termination of its contract with PK.

The EPA's decision to issue a new solicitation meant that it would not seek the revival of bids under the IFB. Thus, for all intents and purposes, the EPA's decision constituted the cancellation of the procurement. See also Klinge Corp. v. United States, 83 Fed. Cl. 773, 773-74, 776 (2008) (finding a "de facto cancellation" where the procuring agency did not formally cancel the solicitation after the contract award was overturned as a result of a protest and the contracting officer "could have revived it by asking [the offeror] to renew its proposal"); Magnavox Advanced Prods. & Sys. Co., B-215426, 85-1 CPD ¶ 146 (Comp. Gen. Feb. 6, 1985) (finding a "de facto cancellation" when the procuring agency rejected the sole offeror and resolicited the requirement).

In an attempt to avoid this conclusion, defendant argues that it was not possible for the EPA to cancel the procurement once the contract had been awarded to PK. It relies on FAR

---

[12] FAR 14.404-3 requires that "[w]hen it is determined necessary to reject all bids, the contracting officer shall notify each bidder that all bids have been rejected and shall state the reason for such action."

[13] Defendant asserts that by awarding the contract to PK and notifying the other bidders that their bids had not been accepted, the EPA rejected those other bids. Def.'s Resp. & Cross-Mot. 24. This is incorrect. FAR 14.404-2 and FAR 14.409-1(a)(1) clearly distinguish between bids that are rejected as being nonconforming or otherwise unacceptable, and potentially conforming bids that are not accepted due to their higher price.

14.101, which describes the five steps in the sealed bidding process: (1) preparing an IFB, (2) publicizing the IFB, (3) submitting bids, (4) evaluating bids, and (5) awarding the contract. Under defendant's interpretation of this provision, an award of a contract pursuant to the sealed bidding process concludes the procurement. Defendant is mistaken; a contract award does not end a procurement. Rather, a procurement remains ongoing during contract performance and does not conclude until the contract is closed out. 41 U.S.C. § 111 (2012) ("[T]he term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."); accord Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (adopting a definition identical to the one appearing in 41 U.S.C. § 111 to determine the existence of a procurement for the purposes of 28 U.S.C. § 1491(b), which defines the bid protest jurisdiction of the Court of Federal Claims); see also FAR 2.101 (defining procurement to mean "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease"). FAR 14.101 does not bar a procuring agency from returning to an earlier stage of the sealed bidding process if the agency is unable to proceed under an awarded contract. In fact, once a procuring agency terminates a contract awarded through the sealed bidding process, there appear to be no legal obstacles preventing the agency from seeking to revive earlier bids. See, e.g., Performance Textiles, Inc., B-256895, 94-2 CPD ¶ 65 (Comp. Gen. Aug. 8, 1994) (holding, when a contract is terminated for default, "that it is reasonable to award a repurchase contract to the next low responsive, responsible bidder on the original solicitation at its original bid price provided that there is a relatively short time span between the original competition and the default and there is a continuing need for the items"); V & Z Heating Corp., B-224725, 86-2 CPD ¶ 472 (Comp. Gen. Oct. 20, 1986) (holding that a procuring agency may permit a second-low bidder to revive its expired bid after terminating the contract awarded to the lowest bidder for the submission of an inadequate bid guarantee, so long as it "would not compromise the integrity of the competitive bidding system" to do so); Architectural Window Sys., Inc., B-213799, 84-1 CPD ¶ 326 (Comp. Gen. Mar. 19, 1984) (holding that a procuring agency could, after awarding a contract, seek to revive a withdrawn bid upon determining that the withdrawal of the bid was based on its erroneous interpretation of the IFB); Ubique, Ltd., DOTCAB No. 71-28, 72-1 BCA ¶ 9340 (noting that the procuring agency, after terminating the originally awarded contract for default, awarded a new contract to the second-low bidder after asking the second-low bidder to extend its bid acceptance period); see also Rice Servs., Ltd. v. United States, 25 Cl. Ct. 366, 368 (1992) (holding that the integrity of the competitive acquisition process is not compromised when a procuring agency asks all offerors to revive their proposals after the expiration of the acceptance period); TCA Reservations, Inc., B-218615, 85-2 CPD ¶ 163 (Comp. Gen. Aug. 13, 1985) ("[A] bidder may extend its acceptance period, and thus revive its expired bid, where it offered the acceptance period required by the IFB, and revival of the bid would not compromise the integrity of the competitive bidding process.").

In short, once the EPA decided to issue a new solicitation to procure a replacement soil remediation contract rather than seek to revive bids under the existing IFB, it constructively cancelled the procurement.

**2. Plaintiff Has Not Established That the EPA's Cancellation of the Procurement Lacked a Rational Basis**

When it became clear to the EPA that its contract with PK would be terminated, it was faced with a decision–should it request that the other bidders revive their bids by extending their bid acceptance periods or should it pursue the cancellation of the procurement? As noted above, the EPA effectively chose the latter approach. However, as plaintiff notes, the rationale for the EPA's decision is not documented in the corrected administrative record. A February 15, 2013 electronic-mail exchange indicated only that the EPA would endeavor to quickly award a new contract, and March 1, 2013 electronic-mail messages were directed at setting up a conference call to discuss a new contract. None of these communications addressed how the EPA planned to award the new contract. And, when the EPA finally expressed its intent to issue a new solicitation to replace its contract with PK–via a statement made by Ms. Nero on March 5, 2013, that was relayed to defense counsel–it provided no explanation for the decision. In fact, the record does not contain even a post hoc explanation of the EPA's decision to resolicit the soil remediation requirement instead of seeking the revival of bids under the existing IFB.

Nevertheless, pursuant to binding precedent, the EPA is not required to provide an explanation for its decision. Government contract officials are presumed to "exercise their duties in good faith." Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). A protestor seeking to overcome this "strong presumption" bears a heavy burden of proof. Id. at 1238-39. Where, as here, there is no regulation requiring an agency to provide an explanation for its decision,[14] the presumption of regularity renders an explanation unnecessary "unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1338.

In an attempt to rebut the presumption of good faith, plaintiff emphasizes the fact that it protested the award of the soil remediation contract to PK and maintained the protest until, and after, the EPA constructively cancelled the procurement. Plaintiff argues that the existence of a protest challenging the propriety of the contract award precluded the EPA from unilaterally concluding the procurement. Rather, plaintiff contends, the only option available to the EPA that would ensure that it acted with the "integrity, fairness, and openness" required by FAR 1.102(b)(3) and FAR 1.102-2(c)(1) was to proceed under the IFB and seek the revival of bids. Plaintiff also argues that the duty to treat bidders impartially required the EPA to ask plaintiff to extend its bid acceptance period because the EPA had previously allowed PK, as the presumptive

[14] FAR 14.404-1(c) requires a written determination in support of a cancellation decision, but as noted above, and as conceded by plaintiff, Pl.'s Reply & Resp. 5-6 n.2, FAR 14.404-1 is not applicable here.

awardee, to extend its bid acceptance period.[15] Finally, plaintiff suggests that the EPA's cancellation decision was made in bad faith, contending that the EPA was either attempting to punish it for filing the two protests or to avoid continued litigation.

Plaintiff's contentions are insufficient to overcome the presumption that the EPA acted in good faith in constructively cancelling the procurement. First, the existence of a bid protest does not deprive a procuring agency of the authority to take action in connection with the procurement at issue. Indeed, agencies might, for example, decline to stay performance of a contract during the pendency of a protest or choose to take corrective action in response to the protest. If the protestor objects to such actions, it may seek relief in the appropriate administrative or judicial forum. Thus, the fact that plaintiff was protesting the EPA's award of the contract to PK in the Court of Federal Claims did not, in and of itself, prevent the EPA from terminating its contract with PK and cancelling the underlying procurement.

Second, the fact that the EPA allowed the presumptive awardee, PK, to extend its bid acceptance period to allow for the award of the contract does not mean that the EPA was required to ask plaintiff to extend its bid acceptance period five months later upon the termination of PK's contract. The award of the contract to PK effectively reset the EPA's duty of impartiality to the bidders in the procurement. Upon the termination of PK's contract, the EPA's obligation applied only to its treatment of the remaining bidders in relation to each other; its prior treatment of PK was irrelevant. Third, there is absolutely no support in the corrected administrative record for the contention that the EPA decided to cancel the procurement due to animus towards plaintiff or as a litigation avoidance tactic. The court declines to assign improper motives to the EPA based on innuendo.

Altogether, plaintiff has cited no evidence in the corrected administrative record suggesting that the EPA's decision to cancel the procurement was not made in good faith. Moreover, plaintiff has not identified any legal authority for the proposition that the EPA was required to seek the revival of bids upon the cancellation of the procurement; indeed, the decisions describing circumstances analogous to those present here–V & Z Heating Corp. and Architectural Window Sys., Inc.–suggest that seeking the revival of bids after the original contract is terminated is a permissive, not a mandatory, act. Accordingly, the court concludes that plaintiff has not met its heavy burden of proving that the EPA did not act in good faith when it cancelled the procurement or that the EPA's cancellation decision lacked a rational basis.

## IV. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to dismiss and plaintiff's motion for judgment on the administrative record, and **GRANTS** defendant's cross-

---

[15] Although not cited by plaintiff, the duty to treat bidders impartially, fairly, and equally is imposed on contracting officers by FAR 1.602-2(b).


motion for judgment on the administrative record. Plaintiff's protest is **DISMISSED** with prejudice. No costs. The clerk is directed to enter judgment accordingly.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Friday, August 22, 2014**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge